In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-21-00154-CR**
_____

**DEWAYNE LEE WALDRUP, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 435th District Court**
**Montgomery County, Texas**
**Trial Cause No. 20-10-12141-CR**

## MEMORANDUM OPINION

A jury convicted Dewayne Lee Waldrup of the second-degree felony offense of possession of a controlled substance, cocaine, in an amount greater than four grams but less than 200 grams. *See* Tex. Health & Safety Code Ann. § 481.115(a), (d). After finding two enhancement paragraphs true, the jury assessed punishment at fifty years of confinement. *See* Tex. Penal Code Ann. § 12.42(b) (providing enhanced punishment for habitual offenders). In thirteen issues, Waldrup complains: the trial court violated his due process rights by denying his motion to dismiss the

indictment without a hearing; the evidence is legally insufficient to support his conviction; the trial court erred by failing to include his requested voluntariness instruction in the application paragraph of the jury charge; the regional presiding judge summarily failed to hold a hearing on his two motions to recuse; the trial court erred by granting the State's motion to quash the subpoena for the Honorable Paul Damico; the trial court should have suppressed evidence from his arrest; the trial court erred by denying his motion to dismiss appointed counsel and failing to replace him with an attorney who would follow Waldrup's directions; the trial court erred by denying his motion to dismiss based on "outrageous prosecutorial misconduct" after his case was reindicted; the trial court violated his right to represent himself by delaying a *Faretta* hearing; and the trial court erred by denying his motion to quash the indictment without a hearing. As discussed below, we affirm the trial court's judgment.

PRETRIAL MOTIONS AND RULINGS

Waldrup filed various motions to dismiss, a motion to quash the indictment, motions to recuse, motions to suppress, and motions regarding his right to self-representation throughout the proceedings. On appeal, he complains about certain pretrial rulings the trial court made on some of these motions. We will address the pertinent factual background and procedural history concerning these pretrial rulings

2

with the individual issues raised below as necessary to resolve the specific complaints he raises on appeal.

EVIDENCE AT TRIAL

<u>Sergeant Paul Hahs's Trial Testimony</u>

Hahs is a sergeant with the Montgomery County Sheriff's Office (MCSO) assigned to the homicide and violent crimes unit. Hahs testified that on October 25, 2019, he participated in an MCSO operation to surveil a local bank and businesses that were targets of "jugging operations." Hahs described jugging as when a suspect sits and surveils a bank and watches for a customer to come out with money in their hand, then follows them home or to another business and burglarizes their residence or vehicle to steal their money. Officers were looking for suspects involved in jugging of bank customers.

Hahs was assigned to watch for suspicious activity at the Chase Bank in New Caney, located in Montgomery County. On the police radios, Hahs heard there was activity at Chase Bank, and a black Ford Explorer was identified as a suspect's vehicle, which he later observed. Hahs explained nobody exited the vehicle or came to the car to drop anything off, which is typical of a jugging suspect. Hahs testified their suspicions increased when a customer exited the bank and left in a Dodge truck, and as that truck drove away, the suspect vehicle followed it "turn-for-turn, stop-for-stop for quite a ways." The suspect vehicle lost the Dodge truck in a neighborhood,

3

so the officers returned to their original positions, and Hahs learned on the radio that the suspect's vehicle returned to Chase Bank. The suspect's vehicle then followed another vehicle from the bank in the same direction but got caught at a traffic light and could not continue. The suspect's vehicle then returned to Chase Bank and parked in front of the bank.

Hahs testified that the sergeant in charge decided to run a "decoy operation" and send an officer in to pretend to be a customer, and Hahs volunteered to be the decoy. Inside the bank, Hahs met with the manager briefly to let her know he was a police officer, then he met with the clerk and requested something that resembled "a large wad of money." They provided Hahs with a cash envelope full of blank printer paper. He exited the bank pretending to be on his cell phone and waving the stuffed envelope in his hand. The suspect's vehicle was two spaces to his left with two people in it. Hahs testified the driver had a "thinner body frame[,]" and the passenger "had a larger frame" and "appeared to be more heavyset." Hahs could tell that the vehicle's occupants were male.

Hahs notified other officers on the radio that they were leaving, and the suspect's vehicle began following him "turn-for-turn." He parked in the Walmart parking lot, and the suspect's vehicle followed him. He testified he put the envelope on his center console in plain sight then walked into Walmart and left an open parking space on the driver side of his truck. Hahs positioned himself inside Walmart

4

so he could watch his truck, but he did not have a full view of his vehicle, because there were other cars in the parking lot. He observed the suspect's vehicle pass in front of the store, then back in next to his vehicle. Hahs did not see what happened next but heard radio traffic that a male exited the car and tried to get into his truck, then they were given the "bust signal[.]"

Hahs testified he ran out of Walmart to his truck, where he observed a male lying between his truck and the suspect's vehicle in handcuffs and another male in handcuffs outside the vehicle on the passenger side. The person on the driver side was David Thomas, "a thin build, African-American male[.]" Hahs identified Waldrup in court as the passenger. Booking photos of Waldrup and Thomas were admitted at trial during Hahs's testimony and were consistent with Hahs's description.

Video from the Walmart parking lot was admitted without objection. Hahs testified the video showed the suspect's vehicle back into a space, with the driver's door next to his vehicle. Hahs testified that the video did not show what happened between the vehicles, but you could see the police units converge on the area and Hahs running to the vehicle. Hahs testified that although they did not break the window or get into the vehicle, officers saw enough to detain the men and find out what was going on, since they did not have permission, giving officers reasonable suspicion of criminal activity.

5

Hahs testified that when detectives interviewed Waldrup, he told them they left Houston in the suspect vehicle, stopped at a bank to deposit some money, drove around, and smoked marijuana. Hahs testified that Waldrup confirmed to detectives that he was the passenger in the vehicle.

Trial Testimony of Deputy Matthew McCord

Deputy McCord works for the MCSO and is assigned to the Organized Crimes Unit, where he focuses on narcotics and conducts surveillance. As a member of the Organized Crimes Unit, McCord works with the Drug Enforcement Agency ("DEA"). McCord testified he has experience and training investigating narcotics and knows how they appear and are packaged.

McCord testified he was also assigned to the operation that conducted the bank-jugging sting in the New Caney area. McCord was assigned to surveil Chase Bank and parked in a lot north of the bank. McCord said just before 2:00 p.m., he observed a "black Ford SUV with Tennessee tags" arrive at the bank. He explained the suspect vehicle was parked in a spot where they could see the front door. McCord saw no one get out of the suspect vehicle, which was suspicious.

McCord testified the suspect vehicle then followed someone in a work truck who left the bank, but that was not a successful jugging, and the suspect vehicle eventually returned to the bank. McCord said the suspects eventually followed another vehicle, which also did not succeed. McCord explained that when the

6

suspects again returned to the bank, a decoy was put into the operation. McCord testified that when the decoy, Hahs, left the bank with an envelope, the suspect vehicle followed him to Walmart.

At Walmart, McCord could not see the attempted break in from his location but was listening on the radio. After the signal was given, he waited at his location in the Walmart parking lot to make sure everything went smoothly. Once everybody was detained, McCord drove up to the scene but never saw who was in the passenger or driver seats. McCord testified that when he arrived at the scene, Waldrup and Thomas were already detained and handcuffed, and because he did not see them, he assumed they were in patrol cars.

McCord was assigned to take photographs as officers inventoried the vehicle. He photographed items in the front passenger seat area. McCord testified that in the front passenger area floorboard, he observed an eyeglass case. There "was a bunch of stuff" on the floorboard with the glasses, and he photographed that area. McCord testified that in the eyeglass case there were two baggies, containing what looked like cocaine, one powder and one rock that field tested positive, along with a pill bottle of tablets. During McCord's testimony, photographs of the items in the passenger floorboard were admitted into evidence without objection. The laboratory report regarding the substances was also admitted during McCord's testimony without objection. McCord testified that the reports concluded one bag contained

7

3.8 grams of cocaine, and the other bag contained 2.12 grams of cocaine, totaling more than four grams.

McCord added that in narcotics investigations, they try to determine who has possession of the substance. McCord explained that the location of the substance is a relevant factor, including who was sitting closest to it, and typically, this is not the type of thing left lying around.

Testimony of Tim Slusher

Slusher testified that in October 2019, he was a digital evidence examiner assigned to the crime laboratory and performed extractions on cell phones, computers, and other electronic devices. He performed digital forensics on four cell phones. Slusher testified that before they perform a search on cell phones, they must have a warrant or the owner's consent. Slusher said that in this case, there was a search warrant for all four phones. One of the phones was a Samsung SMG955U and another was a Samsung J737T1. After he extracted the data, he did not analyze the results but sent the generated report to the detective for review. Slusher testified if there were identifiers obtained, they would be in the report, and he did not have any information about who owned the devices.

Testimony of Deputy Thomas Epperson

Deputy Epperson works in the MCSO Patrol Division. In October 2019, he was assigned to the Auto Theft Task Force and participated in the bank jugging

operation. Epperson testified he was in a marked unit and was part of the "takedown units set back away in case we needed it." He explained they would be used if a traffic stop was needed or if they needed a visible police presence. Epperson said he was about half a mile east of Chase Bank in a church parking lot. He monitored the radio and waited for them to call. Ultimately, Epperson heard a bait car was introduced and suspects were detained.

Epperson testified that when he arrived, two suspects were detained, and his sergeant assigned him to be the lead investigator. Epperson testified he did not personally observe what happened in the parking lot and was not there when they called for a takedown. Epperson was told that Thomas was the driver and Waldrup was the passenger. Nobody told Epperson whose possession the cocaine was in, but they told him where it was located.

Epperson explained that he began gathering information and assigning people to collect the information for the investigation. Epperson testified that he did not personally participate in the vehicle inventory and did not take custody of the evidence from the vehicle, it was instead submitted to the crime lab for safekeeping.

Epperson said they recovered four phones, and he obtained a warrant to search them. He testified that Detective Slusher performed the phone analysis, and Epperson reviewed the results of those extractions. He also explained that the suspect vehicle was owned by a rental car company, so they contacted the rental

9

company to determine who rented it and for how long. They then obtained consent to search the infotainment system from the company's loss prevention manager, and when they obtained consent, the rental period for the vehicle had terminated. Epperson testified the regional crime lab performed a download of the infotainment system and provided Epperson with the information, which he reviewed. Google images downloaded from the infotainment system showing the vehicle's movements on that day were admitted into evidence during Epperson's testimony.

Testimony of Detective Johnathan Jordan

Detective Jordan works for MCSO and is assigned to the DEA Major Drug Squad in Houston. He testified he is trained in identifying narcotics and knows slang terminology for narcotics. Jordan testified that on October 25, 2019, he participated in surveillance for the bank-jugging operation in New Caney. Jordan testified he conducted mobile surveillance and followed the suspect vehicle. Jordan observed the vehicle follow two victim vehicles and later learned there would be a bait car used in the operation.

Jordan testified that once the bait car was deployed, he moved from the bank to the Walmart parking lot. Jordan was in the Walmart parking lot before Sergeant Hahs arrived and could see where Hahs went when he arrived. Jordan testified he saw Hahs's vehicle and eventually observed the suspect vehicle back in next to Hahs's vehicle. Jordan testified that he "could see very clear[,]" and the driver got

out and "looked like he was attempting to gain entry into the vehicle." Jordan explained that "he came up and either was messing with the door or looking into it or some fashion like that." Jordan testified that by then, he already believed the person was engaging in bank jugging since they followed other vehicles before following Hahs. Jordan aired on the radio that it appeared the suspect was getting in or breaking in but did not recall his exact words, "and units converged on the vehicle."

Jordan testified he then approached the vehicle. By the time he moved to their location, the driver and passenger had been removed from the vehicle. Jordan identified Waldrup as the passenger. Jordan testified that when he approached the suspect vehicle, the doors were open, and he detected the odor of unburnt marijuana. Jordan said that once everything was secured, he was tasked with the vehicle search and inventory, and after it was evident the odor of marijuana was coming from inside the suspect vehicle, Jordan began a search of the vehicle.

He found three cell phones inside the suspect vehicle and a fourth was provided to him, and he was told it was from one of the individuals. One of the phones was a Samsung Galaxy S8 model number SMG955U and another was a gray Samsung model number J767T1. Jordan located a sunglass case on the passenger floorboard, a key card, gloves, and a glass bottle with tobacco in it, as shown in a photograph admitted as State's Exhibit 13. Regarding the photograph, Jordan

11

testified you could see cigarillo packets and loose marijuana scattered on the floor. Jordan testified this was common, since people who smoke marijuana remove the tobacco from the cigars and fill the wrapping with marijuana, which explained the bottle containing loose tobacco. Jordan testified that inside the sunglass case he found a baggie with powder cocaine, another baggie containing crack cocaine, and a pill bottle with several types of prescription pills. He said another photograph admitted into evidence showed the interior of the eyeglass case. Jordan identified a "distinctive Xanax pill" because it was "rectangular shaped, look[s] kind of like a bar." Jordan explained the street term for Xanax pills was "[b]ars." Jordan testified the two baggies seized with the pills were sent for analysis and came back positive for cocaine.

Jordan testified it was common for people carrying drugs to put them in a container. He said part of his job is determining who possessed the drugs, and the location of the drugs in relation to the person is important; the context of the scene and "totality of everything that comes together" are also factors. Jordan explained that items around the drugs are important, because if you can identify the relationship and other items with it, you can determine who the drugs belong to. Jordan testified that if someone knew about the drugs, that is also important as it shows whoever was in possession knew they were there. Jordan testified he believed the drugs belonged to the passenger "based on the location and the way it went." Jordan testified that he

12

explored other evidence, and his opinion about who the drugs belonged to did not change, it grew stronger.

A photograph of a Quality Inn hotel key card was admitted into evidence, and Jordan testified the key card became important, because the J737T1 cell phone had text messages that referenced the hotel's address. Text messages from that cell phone were also admitted. Jordan reviewed the J737T1 cell phone's text messages, photos, and contact list, and believed the phone belonged to Waldrup, because there were selfies on the phone of Waldrup. Jordan also explained that several incoming texts referred to the person who possessed the phone as "Dewayne." Jordan testified other photos of interest in the phone included some of the narcotics. Text messages from the phone provided a room number at the Quality Inn and the hotel's address. Jordan explained that when you identify the owner of the cell phone, the location of the key card, and the location of the drugs, it all ties together. Jordan also testified that a recorded jailhouse conversation between Waldrup and his girlfriend involved him telling her he was charged with possession, and when she asked if it was for the pills, he said yes.

After the State rested, the trial court denied Waldrup's Motion for Directed Verdict. The jury found Waldrup guilty, found both enhancement paragraphs true, and assessed punishment at fifty years of confinement.

13

ANALYSIS

Issue Two: Sufficiency of the Evidence

We begin our analysis with Waldrup's second issue in which he challenges the sufficiency of the evidence, because if sustained, it would entitle him to a judgment of acquittal and rendition. *See Benavidez v. State*, 323 S.W.3d 179, 181 (Tex. Crim. App. 2010) (explaining appellate courts render judgment of acquittal only if trial court's ruling amounts to *de facto* acquittal or appellate court determines evidence was legally insufficient to support conviction); *O'Reilly v. State*, 501 S.W.3d 722, 726 (Tex. App.—Dallas 2016, no pet.) (addressing legal sufficiency issues first, because if meritorious, court would render judgment of acquittal). Waldrup specifically argues that the trial court erred in denying his Motion for Directed Verdict, because the State failed to prove he committed all elements of the crime and failed to prove sufficient affirmative links existed to tie him to the cocaine found in the car.

We review complaints of legal insufficiency under the standard in *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); s*ee Fernandez v. State*, 479 S.W.3d 835, 837 (Tex. Crim. App. 2016). Under *Jackson*, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original); *see Brooks v. State*, 323 S.W.3d 893, 912

14

(Tex. Crim. App. 2010). We defer to the jury's responsibility to resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from the evidence. *See Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We presume the jury resolved any conflicts in the testimony in favor of the verdict. *See Brooks*, 323 S.W.3d at 899 n.13. We treat direct and circumstantial evidence equally and "consider the combined and cumulative force of the evidence" viewed in the light most favorable to the jury's verdict. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

Waldrup was indicted for "intentionally or knowingly possess[ing] a controlled substance, namely, cocaine, in an amount of four grams or more but less than 200 grams[.]" *See* Tex. Health & Safety Code Ann. § 481.115(a), (d). To establish Waldrup committed the offense of possession of a controlled substance, the State had to prove that Waldrup exercised care, custody, control, or management over the cocaine and knew the substance was cocaine. *See id.* §§ 481.002(38); 481.115(a); *Poindexter v. State*, 153 S.W.3d 402, 405 (Tex. Crim. App. 2005), *abrogated on other grounds by Robinson v. State*, 466 S.W.3d 166, 173 & n.32 (Tex. Crim. App. 2015). The evidence must show Waldrup's connection with the cocaine was more than just fortuitous, and we apply an "affirmative links" analysis. *See Poindexter*, 153 S.W.3d at 405–06. When a defendant does not have exclusive possession of the place where the controlled substance is discovered, facts

15

beyond "mere presence" must link him to the illegal substance. *Tate v. State*, 500 S.W.3d 410, 413–14 (Tex. Crim. App. 2016). The non-exclusive factors that may establish an affirmative link between a defendant and the substance are:

> "(1) the defendant's presence when a search is conducted; (2) whether the contraband was in plain view; (3) the defendant's proximity to and the accessibility of the narcotic; (4) whether the defendant was under the influence of narcotics when arrested; (5) whether the defendant possessed other contraband or narcotics when arrested; (6) whether the defendant attempted to flee; (7) whether the defendant made furtive gestures; (8) whether there was an odor of contraband; (9) whether other contraband or drug paraphernalia were present; (10) whether the defendant owned or had a right to possess the place where the drugs were found; (11) whether the place where the drugs were found was enclosed; (12) whether the defendant was found with a large amount of cash; and (13) whether the conduct of the defendant indicated a consciousness of guilt."

*Id.* at 414 (quoting *Evans v. State*, 202 S.W.3d 158, 162 n.12 (Tex. Crim. App. 2006)) (other citation omitted). The State need not prove exclusive possession of the contraband, as control may be jointly exercised by more than one person. *McGoldrick v. State*, 682 S.W.2d 573, 578 (Tex. Crim. App. 1985).

The position of individuals in a vehicle is often relevant to determining who has possession of contraband in a car. At trial, officers testified that Waldrup was sitting in the passenger seat of the vehicle. Officers said they found the cocaine and pills in a sunglass case on the passenger floorboard. Officers also found a Quality Inn hotel key card in the car, and the jury heard testimony that marijuana was scattered on the floorboard. Photographs, which were admitted at trial, aligned with

16

the officers' testimony. Detective Jordan testified there was an odor of unburnt marijuana coming from the vehicle. Sergeant Hahs testified that Waldrup admitted that he and Thomas (the driver of the car) had smoked marijuana earlier that day.

In the subsequent search conducted by police of the cells phones that were in the car, they found further evidence linking Waldrup to the cocaine found on the passenger side of the car. According to the officers who conducted the investigation, the "selfie" photographs found on the Samsung J737T1 phone were photos of Waldrup. Text messages on the same J737T1 phone referred to the individual who possessed the phone as "Dewayne." The J787T1 phone, which the testimony of the officers tied to Waldrup, contained text messages that linked it to the hotel key card.

Officers testified that Xanax "bars" were found among the pills in the eyeglass container, which as mentioned also contained cocaine. A recorded conversation between Waldrup and his girlfriend from the jail was admitted in evidence. In the recording, Waldrup's girlfriend asked him if he was charged with possession of the pills, and he said that he was.

When viewed as a whole, there are facts beyond Waldrup's "mere presence" at the scene that are sufficient to affirmatively link him to the cocaine the police found in the car Thomas was driving that day. *See Tate*, 500 S.W.3d at 413–14. Thus, "[b]ased on the combined and cumulative force of the evidence and any reasonable inferences therefrom," the jury was "rationally justified in finding guilt beyond a

17

reasonable doubt[.]" *Id.* at 414 (citing *Jackson*, 443 U.S. at 318–19). The trial court did not err in denying Waldrup's Motion for Directed Verdict. We overrule issue two.

Issue One: Denial of Motion to Dismiss Without a Hearing

In his first issue, Waldrup complains the trial court violated his constitutional right to due process when it refused to conduct a hearing on his Motion to Dismiss. Throughout the proceedings, Waldrup filed multiple motions to dismiss while acting *pro se*. In his brief, he references an incomplete filing that complains of missing evidence. He also references a request for a hearing made on July 29, 2020, for a Motion to Dismiss he said he planned to file but that had not yet been filed. The trial court then advised Waldrup he had until August 13 to file his Motion to Dismiss, and the State would have until August 20, 2020, to respond in writing to the Motion to Dismiss. The trial judge explained that upon receiving the written motion and response, she would determine whether a hearing date was needed and if so, would give Waldrup a date.

The trial court held another hearing on September 2, 2020, and asked how much advanced notice Waldrup would need for the hearing on the Motion to Dismiss since he planned to subpoena witnesses. After some discussion, the trial court offered September 15 to give Waldrup more time, and Waldrup responded that date was acceptable. However, the day of the scheduled hearing on the Motion to

18

Dismiss, Waldrup filed a Motion for Continuance, a Motion for Recusal, and a Motion for Discovery. The trial court noted it could not take any action until the Motion for Recusal was resolved and advised the parties that it would reset the remaining motions "for the following Tuesday" to which Waldrup said he was agreeable. The trial court next held a hearing on September 30, 2020, noting the regional presiding judge had denied the Motion for Recusal, and that they needed to reschedule Waldrup's remaining motions for a hearing since he argued in a Motion for Continuance he needed more time to call witnesses. The trial court then asked about his Motion for Speedy Trial, and Waldrup responded that "[a]ll dispositive motions . . . the motion to dismiss, the motion to quash the indictment, they can be carried over to trial[.]" The record does not reveal Waldrup requested another hearing on the Motion to Dismiss pertaining to missing evidence before trial. Even so, on March 1, 2021, right before the scheduled voir dire, the trial court held a hearing on Waldrup's various motions to dismiss.[1] During this hearing, Waldrup was present, had an opportunity to present issues, and did not raise complaints about missing evidence as a basis for dismissal. The trial court then denied the Motion to Dismiss.

---

[1]Voir dire and trial did not proceed as scheduled on March 1, 2021, since following the pretrial motions hearing, which included the denial of a Motion for Continuance, Waldrup withdrew his waiver of counsel.

"To preserve a complaint for appellate review, there must be a timely, specific objection and a ruling by the trial court." *State v. Lerma*, 639 S.W.3d 63, 66 (Tex. Crim. App. 2021) (citing Tex. R. App. P. 33.1(a)). The point of error on appeal must comport with the trial objection, and constitutional errors can be waived if a party fails to properly object. *See Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012). The record does not show that Waldrup complained about the trial court's failure to hold a hearing on the Motion to Dismiss he filed based on missing evidence. *See, e.g., Adams v. State*, 132 S.W.3d 701, 702 (Tex. App.—Amarillo 2004, no pet.) (holding appellant did not preserve complaint for review where he failed to complain to the trial court about its failure to hold a hearing on a motion to suppress). Waldrup has failed to preserve this complaint. *See Lerma*, 639 S.W.3d at 66; *Clark*, 365 S.W.3d at 339; *see also* Tex. R. App. P. 33.1(a). Even so, the record establishes that the trial court held a hearing on Waldrup's various motions to dismiss, he was present, and afforded an opportunity to argue these motions to the trial court. We overrule issue one.

Issue Three: Jury Charge and Denial of Voluntariness Instruction

In his third issue, Waldrup argues that the trial court erred by refusing his proposed application paragraph in the jury charge which incorporated the issue of "voluntariness." The court's jury charge reads as follows:

20

The following definitions apply in regard to the law concerning the Possession of a Controlled Substance. The definition of a term applies to each grammatical variation of the term.

"Possession" means actual care, custody, control, or management. Possession is a voluntary act if the possessor knowingly obtains or receives the thing possessed or is aware of his control of the thing for a sufficient time to permit him to terminate his control.

"Adulterant or dilutant" means any material that increases the bulk or quantity of a controlled substance, regardless of its effect on the chemical activity of the controlled substance.

A person acts intentionally, or with intent, with respect to the nature of this conduct when it is his conscious objective or desire to engage in the conduct.

A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist.

**Applying the Law on Possession of a Controlled Substance to This Case**

Now, if you find from the evidence, beyond a reasonable doubt that in Montgomery County, Texas, on or about October 25, 2019, the defendant, DEWAYNE LEE WALDRUP, did then and there unlawfully, intentionally or knowingly possess a controlled substance, namely, cocaine, of four grams or more but less than 200 grams, including any adulterants or dilutants then you will find the defendant guilty as charged in the indictment.

Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict "Not Guilty."

During the charge conference, Waldrup requested the following application paragraph:

Therefore, if you find from the evidence beyond a reasonable doubt that on or about October 25, 2019, in Montgomery County, Texas, cocaine was found in a 2019 Ford Explorer inside of a closed container; but you further find from the evidence that the Defendant did not voluntarily possess the cocaine, or if the prosecution has failed to persuade you beyond a reasonable doubt that the Defendant did voluntarily possess

21

the cocaine, as that term has been previously defined, you will acquit the Defendant and say by your verdict "not guilty."

During trial, Waldrup argued that he wanted the application paragraph to address voluntariness because "the amount of time that knowledge may have been established was brought up with one of the witnesses." The trial court rejected Waldrup's proposed application paragraph, noting that the application paragraph the court used "reads intentionally or knowingly possess a controlled substance and the definitions are before the application paragraph and the definition for possession tracks the penal code, specifically 6.01, as to that term and how it's defined." The State counters that none of the evidence raised the issue of voluntariness.

A claim of jury charge error involves a two-step analysis. *See Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022). We first determine whether the charge is erroneous, then if so, we decide whether the appellant was harmed by the erroneous charge. *See id.*; *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013). There are two standards of review for charge error claims. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g); *see also Alcoser*, 663 S.W.3d at 165. Where, as here, a defendant timely objects to the alleged error, the record must only show "some harm" to obtain relief. *See Alcoser*, 663 S.W.3d at 165; *Almanza*, 686 S.W.2d at 171.

In his brief, Waldrup contends that "the defense asserted the voluntariness aspects of the allegation" and points to statements he made in closing arguments

22

where he focuses on "knowingly" and being "aware" and in "control." A defendant is entitled to instructions on any defensive issue "raised by the *evidence*," no matter how weak. *See Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013) (emphasis added). Waldrup asserts that his closing raised this issue; however, as Texas courts have acknowledged, jury arguments are not evidence. *See, e.g., Gelinas v. State*, 398 S.W.3d 703, 707 (Tex. Crim. App. 2013) (citation omitted); *Gonzales v. State*, 474 S.W.3d 345, 350 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd).

The purpose of the jury charge is to instruct the jurors on all the law that is applicable to the case. *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012). The application paragraph applies the pertinent law, abstract definitions, and general legal principles to the particular facts and the allegations in the indictment. *Id.* The court did not err in refusing Waldrup's requested application paragraph, as it did not incorporate correct statements of the law or apply the law to the facts of the case as raised by the evidence and charged in the indictment. *See id.*

The abstract definitions contained in the court's charge to the jury correctly defined possession as "actual care, custody, control, or management" and explained that "possession is a voluntary act if the possessor knowingly obtains or receives the thing possessed or is aware of his control of the thing for a sufficient time to permit him to terminate his control." Tex. Penal Code Ann. §§ 1.07(a)(39) (defining possession), 6.01(b) (explaining possession as a voluntary act). The charge also

23

correctly defines "intentionally" and "knowingly." *See id.* § 6.03(a), (b). After defining intentionally and knowingly, and explaining when possession constitutes a voluntary act, the trial court submitted an application paragraph in the charge that tracks the statutory language for the offense of possession of a controlled substance based on the allegations in Waldrup's indictment. *See* Tex. Health & Safety Code Ann. § 481.115(a), (d); *see Vasquez*, 389 S.W.3d at 366. In the application paragraph, the trial court further instructed the jury that if they did not so find or if they had reasonable doubt, they must acquit Waldrup. We conclude that Waldrup's third issue complaining about charge error lacks merit, so the issue is overruled.

Issues Four and Five: Denial of Motions to Recuse without Hearings

In issues four and five, Waldrup complains the regional presiding judge erred by denying his motions to recuse without a hearing, which violated his Fourteenth Amendment due process rights. Waldrup argues that a hearing is mandatory under Texas Rule of Civil Procedure 18a(g)(6)(A), because he complied with the requirements of Rule 18a. *See generally* Tex. R. Civ. P. 18a.

Rule 18a governing recusal procedures applies in criminal cases. *Arnold v. State*, 853 S.W.2d 543, 544 (Tex. Crim. App. 1993). We review an order denying a motion to recuse for an abuse of discretion. *See* Tex. R. Civ. P. 18a(j)(1)(A). Rule 18a provides that a motion to recuse:

(1) must be verified;

24

(2) must assert one or more of the grounds listed in Rule 18b;

(3) must not be based solely on the judge's rulings in the case; and

(4) must state with detail and particularity facts that:
(A) are within the affiant's personal knowledge, except that facts may be stated on information and belief if the basis for that belief is specifically stated;
(B) would be admissible in evidence; and
(C) if proven, would be sufficient to justify recusal or disqualification.

Tex. R. Civ. P. 18a(a). A presiding judge may deny a motion to recuse without a hearing if the motion fails to comply with Rule 18a. *See* Tex. R. Civ. P. 18a(g)(3)(A).

In September 2020, Waldrup filed his first Motion for Recusal and generally alleged bias against him personally, against *pro se* defendants, and African Americans. In support of this, he complains about the trial court's rulings regarding his right to self-representation, and he attached an affidavit to support his motion to recuse. In the affidavit, Waldrup alleged that the trial judge allowed an *ex parte* communication, but he does not say who was there, when it occurred, or what was supposedly discussed. Still, Waldrup claims that had he had been given a hearing, he would have been able to put on evidence about this alleged communication.

When the motion was filed, the trial court sent it to the regional presiding judge, who denied it without a hearing. *See* Tex. R. Civ. P. 18a(f)(1). That was appropriate, since the rule that applies to motions to recuse a trial court judge requires the motion to state "with detail and particularity" facts within the movant's

25

personal knowledge that "if proven, would be sufficient to justify recusal[.]" *See* Tex. R. Civ. P. 18a(a)(4)(A)–(C). Since Waldrup's Motion for Recusal and supporting affidavit failed to comply with the requirements of Rule 18a(a)(4), the regional presiding judge did not err in denying Waldrup's first Motion for Recusal without conducting an evidentiary hearing. *See* Tex. R. Civ. P. 18a(g)(3)(A). We overrule issue four.

On May 10, 2021, Waldrup filed his second Motion for Recusal, which the regional presiding judge also denied without a hearing. In his second motion for recusal, Waldrup filed an affidavit alleging that he filed a 42 U.S. §1983 lawsuit against the trial judge, claiming she was involved in a conspiracy to violate his civil rights, that caused the judge to have a financial interest in the outcome of Trial Court Cause Number 20-10-12141-CR. His second Motion for Recusal also asserted that the trial judge "displayed a questionable[] and concerning level of hostility" towards him and she abused her discretion by denying his motions to recuse; however, he didn't specify any particular motion or ruling.

That he sued the trial judge alleging a conspiracy without more would not justify recusing the trial court, even considering the facts Waldrup included in the affidavit he filed with his initial motion to recuse. *See In re Lincoln*, 114 S.W.3d 724, 727 (Tex. App.—Austin 2003, orig. proceeding) ("Suing a judge by itself is an insufficient basis for disqualification or recusal of that judge."); *see*

26

*also Chamberlain v. State*, 453 S.W.2d 490, 492 (Tex. Crim. App. 1970) ("If the mere filing of a civil action against the judge presiding at a criminal case would disqualify him, then any judge would be subject to disqualification at the whim of a defendant."). In *Lincoln*, where a party similarly sued the judge then claimed that meant the judge had a financial interest in the case, the Austin Court of Appeals concluded that the regional presiding judge was well within his discretion to deny the motion to recuse without a hearing. *See id.* Moreover, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. U.S.*, 510 U.S. 540, 555 (1994).

Just like Waldrup's first motion to recuse, the second motion he filed seeking to recuse the trial court failed to comply with the requirements of Rule 18a. The affidavit accompanying his motion doesn't state with "detail and particularity" facts that, if true, would justify the trial court's recusal. *See* Tex. R. Civ. P. 18a(a)(4)(A)–(C). Accordingly, the regional presiding judge did not err by denying Waldup's second Motion for Recusal without conducting an evidentiary hearing. We overrule issue five.

Issue Six: Granting the State's Motion to Quash Subpoena of Magistrate

Waldrup next argues that the trial court "violated [his] Sixth Amendment right to compulsory process, a fair trial, and his Fourteenth Amendment right to due process when it granted the State's Motion to Quash Defendant's Subpoenas and did

27

not compel judicial testimony where extraordinary circumstances existed." Waldrup subpoenaed witnesses to testify at the hearing on his Motion to Suppress, including Associate Judge Damico, the magistrate who oversaw Waldrup's probable cause hearing. Waldrup argued that the form used by the magistrate during the probable cause hearing did not have a check in the space next to "probable cause found," so that meant Judge Damico did not properly determine probable cause. Therefore, he argued extraordinary circumstances existed to justify the trial court issuing a subpoena to compel Judge Damico to appear and testify at his trial.

The State moved to quash the subpoena of Judge Damico and argued the blank form did not mean the judge, who was acting as a magistrate, failed to determine that probable cause existed to justify Waldrup's arrest. On the contrary, the State argued that the trial court set bonds on Waldrup's three charges, and that he allowed two of those to be set at "no bond," which demonstrated that Judge Damico had, in fact, found probable cause to support Waldrup's arrest. The State further argued that since Judge Damico determined probable cause existed to justify his detention and set bonds, he had complied with Texas Code of Criminal Procedure article 15.17. *See* Tex. Code Crim. Proc. Ann. art. 15.17(a) (requiring appearance before a magistrate within forty-eight hours). At the hearing on the Motion to Quash, as an alternative to Judge Damico, the State offered the testimony of the Assistant District Attorney ("ADA") who attended and handled the probable cause docket on whether

28

a probable cause determination was made. The form used by the magistrate, which is dated October 26, 2019, shows that a bond of $750 was set on the misdemeanor charge and that Judge Damico ordered "no bond" as to two of the charges. The trial court granted the State's Motion to Quash, finding Waldrup had not shown extraordinary circumstances existed that would compel a judge to testify.

At the later hearing on the Motion to Suppress, ADA Barnett testified that while he did not recall this specific case, the fact that Judge Damico set bond on the three charges indicated that he had determined that probable cause existed to support Wadlrup's arrest. Barnett explained that the State's recommendation was no bond on the two felonies, and the form noted Waldrup was a habitual felon. Barnett also testified that he had never seen Judge Damico set bond in a case and continue to keep the defendant in custody unless he found probable cause existed. According to Barnett, had Judge Damico concluded probable cause didn't exist, Waldrup would have been released and the Judge would not have set bonds. Barnett added that "in this case, it's obvious that Judge Damico found there was probable cause because he did set bond on these cases."

We review a trial court's ruling on a motion to quash a subpoena for an abuse of discretion. *See Drew v. State*, 743 S.W.2d 207, 225 n.11 (Tex. Crim. App. 1987); *Torres v. State*, 424 S.W.3d 245, 261 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). "[C]ourts have refused to issue subpoenas for judges to testify about the

29

mental processes by which they reached a decision 'absent extreme and extraordinary circumstances.'" *Fears v. State*, 479 S.W.3d 315, 335 (Tex. App.—Corpus Christi-Edinburg 2015, pet. ref'd) (quoting *Gary W. v. State of La., Dep't of Health & Human Res.*, 861 F.2d 1366, 1369 (5th Cir.1988)). Such is not the case before us, since the State offered an ADA who routinely handled the probable cause docket and did so on the day Waldrup appeared before Judge Damico as a substitute witness. *See id.*; *Waller v. State*, No. 01–02–00799–CR, 2004 WL 306032, at *4 (Tex. App.—Houston [1st Dist.] Feb. 19, 2004, no pet.) (mem. op., not designated for publication) (concluding extraordinary circumstances did not exist justifying judge's testimony where another witness could testify about the issue).

We hold the trial court did not abuse its discretion in quashing the subpoena of Judge Damico when an alternate witness was available to testify and thus extraordinary circumstances did not exist that would warrant compelling the judge to testify. *See Torres*, 424 S.W.3d at 261; *see also Fears*, 479 S.W.3d at 335; *Waller*, 2004 WL 306032, at *4. We overrule Waldrup's sixth issue.

Issues Seven, Eight and Nine: Probable Cause

In issues seven, eight and nine, Waldrup contends the trial court should have suppressed evidence resulting from his arrest, including seized cell phones, because: he did not receive a probable cause determination within forty-eight hours; probable

30

cause did not support his arrest before the vehicle search; and there was not probable cause to believe the seized cell phones were contraband.

Waldrup filed a Motion to Suppress before trial, seeking to exclude the evidence seized from the vehicle and any evidence downloaded later from the cell phones. In the Motion, although he acknowledged that he appeared before the magistrate who set bail the day after his arrest, he argued the magistrate did not make an independent probable cause determination. He also argued that he was illegally detained, and the search and seizure of the vehicle were illegal. The trial court conducted a hearing on Waldrup's Motion to suppress, and the State stipulated that it was a warrantless arrest.

At the suppression hearing, Waldrup called Thomas to testify, and he testified Waldrup was with him on October 25. Thomas testified he recalled "officers jumping out" and "told us to get out of the vehicle," then immediately placed them in handcuffs and put them in the vehicle right after placing them in handcuffs. He said he was in exclusive control of the vehicle, and nobody asked for consent to search it. Thomas testified that officers claimed they found fraudulent paperwork and a controlled substance inside his vehicle. Thomas further testified a bag of marijuana was in the back seat of the car, which was rented by Claudia Davidson.

The State then called ADA Barnett, who provided the testimony described in issue six above. The State's next witness in the suppression hearing, Detective

31

Jordan, testified that he participated in the bank-jugging operation at Chase Bank in New Caney. Jordan described bank-jugging as involving someone who watches a bank and follows people who have something of value and attempts to break into the victim's vehicle to steal what is of value, which is what it appeared the suspect vehicle tried to do twice without success. During the operation, the suspect vehicle parked at Chase Bank caught their attention, because it was occupied by two people who did not exit the vehicle for an extended period. Jordan explained that the suspect vehicle followed two vehicles from Chase Bank, which was suspicious, and then returned to the bank.

Jordan then testified that they decided to have an officer in plain clothes enter the bank and come out with a bank envelope, then drive to the Walmart in New Caney to see if the suspect vehicle would follow him. He listened on the radio, and once the decoy officer was deployed, Jordan moved to the Walmart parking lot to observe the other vehicle and assist where needed. Jordan observed the decoy officer park at Walmart, then "the suspect vehicle pulled into the parking lot and backed in next to the undercover vehicle[.]" Jordan then witnessed the driver exit the suspect vehicle, and "it appeared that he was attempting to get into the undercover vehicle." He explained that "it looked like [the driver] was getting into the vehicle – trying to break the window or do something – messing with the door." Jordan said, "I actually thought he did get into the vehicle, and I believe I aired on the radio that he made

32

entry into the vehicle." Marked and unmarked units converged on the vehicle, and they detained the suspect vehicle's occupants. They determined Thomas was the driver, and Waldrup was the passenger.

Jordan testified that as he approached the suspect vehicle, Thomas and Waldrup had already been taken out of the vehicle, and he could smell the odor of unburnt marijuana. After that, they searched the suspect vehicle and located three cell phones, marijuana, pills, powder cocaine, and crack cocaine. They also located another cell phone on the person of one of the suspects.

Deputy Thomas Epperson also testified during the suppression hearing. Epperson was assigned to the Auto Theft Task Force and participated in the bank-jugging operation in a marked unit. Epperson did not personally observe anything before the arrests, and his primary role was the follow-up investigation. Epperson obtained four cell phones and a search warrant to have the phones searched, and a signed copy of the warrant was introduced into evidence at the hearing. Epperson explained that a rental company owned the suspect vehicle, and he contacted their loss prevention manager. He explained that the manager advised that the rental period for the vehicle terminated, and after that, the manager gave signed consent to search the vehicle. Deputy Epperson testified that CSI Tim Slusher later searched the cell phones, and Lawrence Potier searched the vehicle's infotainment system.

Turning to the arguments Waldrup made in the hearing, he claimed that while ADA Barnett testified about the magistrate's normal practices, the form he ordinarily used in making his determination was left blank, so no probable cause determination had been made. For that reason, Waldrup continued, Judge Damico's testimony was material. Waldrup also argued there was no consent to search, he was arrested immediately and placed in a patrol car, and officers decided to search the car to satisfy their suspicion but had no details to justify the search. Finally, as to the cell phones, Waldrup argued that the affidavit for the search warrant does not state who they belonged to, officers had no details or specifics to tie a specific phone to him, and the search they were conducting was merely a fishing expedition for evidence of a crime.

The State disagreed, countering first that the evidence of the magistrate's practice, and the bond he set, would not have been done had Judge Damico not determined probable cause existed to support Waldrup's arrest within forty-eight hours of when it occurred. Second, as to the warrantless arrest and search of Thomas's car the State argued reasonable suspicion of criminal activity supported the magistrate's decision to authorize the search, as required by *Terry v. Ohio*. The investigating officers had evidence that Waldrup was suspected of participating in the two prior, potential "jugging" incidents, along with co-defendant, Thomas, which allowed for a reasonable search of the suspects under *Terry*. In Waldrup's

34

case, the State argued it was apparent that the attempted burglary of a vehicle was imminent or in progress, so officers detained the suspects. Officers then searched the vehicle after smelling the odor of marijuana, all circumstances that when considered together established probable cause given the recent criminal activity in the vehicle and the fact that vehicles, because they are mobile, may be searched without a warrant when police reasonably believe they contain evidence of a crime. Officers searched the vehicle and seized items as instruments or evidence of criminal activity including four cell phones, three in the vehicle and one on the person of the suspects. Later, police obtained a warrant to authorize the search of the phones. Third, with respect to the infotainment system of the car, the rental company that owned the car gave police a signed consent to search the system once the rental period on the car expired.

The trial court denied the Motion to Suppress and made these findings orally: 1) Judge Damico made a timely probable cause determination, and the fact that he set bail shows this, had he not found probable cause, Waldrup would have been released; 2) as to the warrantless search, the trial court found that a valid exception or reasonableness existed for the search and seizure; and 3) as to the search of the cell phones, the application and warrant were admitted into evidence, and there was no showing on behalf of Waldrup that the warrant was invalid.

35

On appeal, this matter was abated and remanded to allow the trial court to make written Findings of Fact and Conclusions of Law. Those Findings of Fact and Conclusions of Law state:

FINDINGS OF FACT

1. On October 6, 2020, the defendant was charged by indictment with possession of a controlled substance.

2. On May 21st, 2021, the defendant filed a motion to suppress evidence obtained as a result of an illegal detention, search, and seizure.

3. On May 25th, 2021, a jury was selected and sworn in the above-styled cause.

4. Prior to the presentation of evidence to the jury, this Court held a hearing on the defendant's May 21st, 2021 motion to suppress.

5. Frank Barnett, with the Montgomery County District Attorney's Office, testified at the hearing on the motion to suppress. Barnett's testimony was credible.

6. On October 25th, 2019, the defendant was magistrated by the Honorable Paul Damico, who found that probable cause existed to hold the applicant on three charges.

7. Judge Damico set bonds for all three charges.

8. Detective John Jordan with the Montgomery County Sheriff's Department testified at the hearing on the motion to suppress. Jordan's testimony was credible.

9. On October 25th, 2019, Jordan was watching the Chase Bank in New Caney, Texas along with other units.

10. While watching the bank, Jordan noticed a black Ford Explorer (suspect vehicle) with Tennessee plates that had been in the bank parking lot for an extended period of time and that was occupied by two people, but neither occupant had exited the vehicle.

11. Jordan observed the suspect vehicle follow two other vehicles out of the parking lot. Jordan was looking for vehicles that followed other cars out of the parking lot as this was a sign of a criminal scheme known as bank jugging. Jordan observed the suspect vehicle return to the bank parking lot after following those other two vehicles out.

12. Jordan knew through training and experience that bank jugging is a scheme involving following people who leave banks with money and then later breaking into their vehicles and stealing the money.

36

13. The suspect vehicle followed an undercover officer's vehicle from the bank parking lot to a Walmart parking lot.

14. Jordan observed the driver of the suspect vehicle exit the suspect vehicle and attempt to enter the undercover officer's vehicle.

15. When the driver of the suspect vehicle attempted to enter the undercover officer's vehicle, marked and unmarked units arrived and placed the driver and the other occupant of the suspect vehicle into custody.

16. The driver of the suspect vehicle was David Thomas. The other occupant was the defendant, Dewayne Waldrup.

17. Thomas testified at the hearing on the motion to suppress. Thomas's testimony was not credible.

18. When Jordan approached the suspect vehicle he observed the odor of unburnt marijuana coming from the vehicle.

19. Jordan recognized the odor of unburnt marijuana through his training and experience as a law enforcement officer.

20. Jordan and other officers searched the suspect vehicle.

21. Jordan and other officers recovered three cell phones, marijuana, pills, powder cocaine, and crack cocaine.

22. Deputy Thomas Epperson with the Montgomery County Sheriff's Office testified at the hearing on the motion to suppress. Epperson's testimony was credible.

23. The cell phones taken from the suspect vehicle were searched pursuant to a valid search warrant signed by Judge Damico.

CONCLUSIONS OF LAW

1. Jordan and other officers on scene had reasonable suspicion to detain Thomas and the defendant based on Jordan's observation that Thomas attempted to break into an undercover officer's vehicle. *See Derichsweiler v. State,* 348 S.W.3d 906, 914 (Tex. Crim. App. 2014) ("Under the Fourth Amendment, a warrantless detention of the person that amounts to less than full-blown custodial arrest must be justified by a reasonable suspicion.").

2. The defendant failed to show that the search warrant authorizing the search of the cell phones taken from the suspect vehicle was defective. *See Davis v. State,* 202 S.W.3d 149, 157 (Tex. Crim. App. 2006).

We review rulings on motions to suppress under a bifurcated standard. *Lerma v. State*, 543 S.W.3d 184, 189–90 (Tex. Crim. App. 2018); *Dugar v. State*, 629

37

S.W.3d 494, 497 (Tex. App.—Beaumont 2021, pet. Ref'd). We give almost total deference to the trial court's findings of fact and review its application of law to the facts *de novo. See Martin v. State*, 620 S.W.3d 749, 759 (Tex. Crim. App. 2021) (citation omitted). We review *de novo* whether a specific search or seizure was reasonable. *See Igboji v. State*, No. PD-0936-20, 2023 WL 2396388, at *4 (Tex. Crim. App. Mar. 8, 2023). In a motion to suppress hearing, "the trial judge is the sole trier of fact and judge of credibility of witnesses and the weight to be given to their testimony." *Lerma*, 543 S.W.3d at 190. When, as here, the trial court issues findings of fact, we review the record in the light most favorable to the trial court's ruling and uphold those findings if the record supports them. *See Martin*, 620 S.W.3d at 759 (quoting *State v. Rodriguez*, 521 S.W.3d 1, 8 (Tex. Crim. App. 2017)). We will uphold a trial court's ruling if correct under any applicable theory of law and reasonably supported by the record. *See id.*; *State v. Ruiz*, 581 S.W.3d 782, 785 (Tex. Crim. App. 2019).

In issue seven, Waldrup asserts the trial court should have suppressed evidence, including the seized cell phones, because he did not receive a probable cause determination within forty-eight hours of his arrest. This argument lacks merit. As discussed in issue six above, despite Waldrup's argument to the contrary, a magistrate made the requisite probable cause determination within forty-eight hours of his arrest. In his Motion to Suppress, Waldrup acknowledged that he appeared

38

before the magistrate the day after his arrest. He added that the magistrate "set bail in the misdemeanor offense" and "denied bail for both felony offenses[.]" The record supports this conclusion in the form of the documentary evidence showing that Waldrup appeared before a magistrate the day after his arrest. It is reinforced by the ADA's testimony at the suppression hearing that the magistrate would not have set bond on the one charge and determined Waldrup should be held without bail on the other two charges unless the magistrate determined probable cause existed. We overrule issue seven.

In issue eight, Waldrup argues that the trial court should have suppressed the evidence gathered from the vehicle, because probable cause did not support his arrest before the vehicle was searched. In support of this contention, he also complains that since the State noted "an arrest occurred" rather than a detention, it is estopped from arguing differently on appeal, and Waldrup points to statements made by counsel during opening arguments and a mention of an arrest during a bail hearing.

We first address Waldrup's judicial estoppel argument. "Judicial estoppel prohibits a party who has taken a position in an earlier proceeding from subsequently taking a contrary position." *Hall v. State*, 283 S.W.3d 137, 156 (Tex. App.—Austin 2009, pet. ref'd) (op. on reh'g) (citing *Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 6 (Tex. 2008)) (other citation omitted). However, the State presented evidence and argued repeatedly in the trial court that Waldrup's initial seizure before

39

the vehicle search was an investigative detention supported by reasonable suspicion rather than probable cause. Based on the record before us, we conclude the State is not estopped from asserting the suspects were detained rather than arrested. *See id.*

The Fourth Amendment protects against unreasonable searches and seizures. *See* U.S. CONST. amend. IV; *Villarreal v. State*, 935 S.W.3d 134, 138 (Tex. Crim. App. 1996). "Under the Fourth Amendment, a brief investigatory detention must be justified by reasonable suspicion." *Matthews v. State*, 431 S.W.3d 596, 602–03 (Tex. Crim. App. 2014) (citations omitted). "A police officer has reasonable suspicion to detain if he has specific, articulable facts that, combined with rational inferences from those facts, would lead him reasonably to conclude that the person detained is, has been, or soon will be engaged in criminal activity." *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011) (citing *Terry v. Ohio*, 392 U.S. 1, 21–22 1968)) (other citations omitted). This is an objective standard which disregards the officer's subjective intent and instead looks to whether an objectively justifiable basis existed for the detention. *See id.* We also look to the totality of the circumstances, and if combined they "reasonably suggest the imminence of criminal conduct, an investigative detention is justified." *Id.* In other words, the issue is whether the totality of reliable information provided specific, articulable facts combined with reasonable inferences derived from those facts, would lead to the

reasonable conclusion that the appellant was committing, or soon would be engaged in some type of criminal activity. *See id.* at 915–16.

In examining the trial court's findings on the Motion to Suppress, we afford the prevailing party the strongest legitimate view of the evidence. *See Wade v. State*, 422 S.W.3d 661, 666–67 (Tex. Crim. App. 2013). The evidence supports the trial court's findings pertaining to Jordan's observations of Waldrup's and Thomas's specific behavior which led to the reasonable conclusion that they were committing or soon would be engaged in criminal activity. *See Derichsweiler*, 348 S.W.3d at 914. Accordingly, the initial detention as officers began to investigate this conduct was justified by reasonable suspicion. *Matthews*, 431 S.W.3d at 602–03.

Courts have held that probable cause exists to search an automobile when the odor of marijuana is discovered. *See Luera v. State*, 561 S.W.2d 497, 498 (Tex. Crim. App. [Panel Op.] 1978) (citing earlier cases); *see also Moulden v. State*, 576 S.W.2d 817, 820 (Tex. Crim. App. [Panel Op.] 1978) (concluding police officers had probable cause to search the vehicle after detecting the odor of marihuana); *Small v. State*, 977 S.W.2d 771, 774 (Tex. App.—Fort Worth 1998, no pet.) (explaining the odor of marijuana alone is sufficient to constitute probable cause to search a defendant's vehicle or objects within the vehicle). Probable cause to search exists when facts and circumstances within the officer's knowledge on the scene would lead a reasonable person to believe that an instrumentality of a crime or

41

evidence of a crime will be found. *Estrada v. State*, 154 S.W.3d 604, 609 (Tex. Crim. App. 2005) (citations omitted). The evidence supports the trial court's finding that officers smelled the odor of unburnt marijuana coming from the vehicle as they detained Waldrup and Thomas. Since the initial detention was proper, given that Jordan detected the odor of marijuana coming from the vehicle, the search of the vehicle was also proper. *See Marsh v. State*, 684 S.W.2d 676, 679 (Tex. Crim. App. 1984) (explaining where initial stop was proper, upon the officer smelling marijuana coming from vehicle, the search was proper). This justified a continued detention and search of the vehicle.

Waldrup also argues he was arrested without a warrant or probable cause. Upon finding marijuana and other narcotics in the vehicle, the officers had probable cause to arrest Thomas and Waldrup without a warrant since they possessed the contraband in the officers' presence. *See* Tex. Code Crim. Proc. Ann. art. 14.01 (providing that an officer may arrest an offender without a warrant if the offense is committed in his presence); *Taylor v. State*, 410 S.W.3d 520, 528–29 (Tex. App.—Amarillo 2013, no pet.). We hold Waldrup's arrest was lawful. We overrule issue eight.

In issue nine, Waldrup contends that there was not probable cause to believe the cell phones were contraband, so the seizure of the phones was improper. The cell

phones were not searched until officers obtained a signed warrant, which Waldrup does not challenge on appeal.

"The 'plain view' doctrine permits an officer to seize evidence of a crime which he sees in plain sight or open view if he is lawfully where he is." *State v. Betts*, 397 S.W.3d 198, 206 (Tex. Crim. App. 2013) (citation omitted). The three requirements to seize an object in plain view are: "First, law enforcement officials must lawfully be where the object can be 'plainly viewed.' Second, the 'incriminating character' of the object in plain view must be 'immediately apparent' to the officials. And third, the officials must have the right to access the object." *Keehn v. State*, 279 S.W.3d 330, 334 (Tex. Crim. App. 2009) (internal citations omitted); *see Betts*, 397 S.W.3d at 206.

The first requirement is met since officers lawfully searched the vehicle, as discussed in issue eight above. *See Betts*, 397 S.W.3d at 206. The second element requires a showing only of probable cause that the observed item is incriminating evidence. *Joseph v. State*, 807 S.W.2d 303, 308 (Tex. Crim. App. 1991) (citation omitted). "A police officer has probable cause to seize an item if 'the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime.'" *Williford v. State*, 127 S.W.3d 309, 313 (Tex. App.—Eastland 2004, pet. ref'd) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)). At the suppression

43

hearing, the State argued that the cell phones were seized as containing "evidence of criminal activity." Waldrup contends there was no probable cause to believe the phones were contraband. However, an item being contraband is not the only reason giving rise to probable cause. An officer also has probable cause to seize an item if the facts available to him would lead to the reasonable belief that an item may contain evidence of a crime. *See id.* The totality of the facts and circumstances known to officers would warrant their belief that the cell phones contained evidence of a crime, thus giving rise to probable cause permitting their seizure. *See id.*; *see also Derichsweiler*, 348 S.W.3d at 914 (discussing collective knowledge doctrine and explaining the cumulative information known to the officers is considered when determining reasonable suspicion). Upon their lawful search of the vehicle, officers found other contraband, including stolen property from another recent bank jugging and narcotics. The search warrant affidavit for the phones was admitted into evidence at the suppression hearing in which Epperson outlined the facts leading to the seizure of the phones. The affidavit also included Epperson's experience in law enforcement and the basis for his belief that the cell phones would contain evidence of a crime. This satisfies the second element of the plain view doctrine. *See Betts*, 397 S.W.3d at 206; *Keehn*, 279 S.W.3d at 334. Finally, given the officers' probable cause to search the vehicle as discussed above, they had the right to seize the cell phones they believed contained evidence of a crime, thus satisfying the last element

44

of the plain view doctrine. *See Betts*, 397 S.W.3d at 206; *Keehn*, 279 S.W.3d at 334. We overrule issue nine.

Issue Ten: Appointed Counsel

In issue ten, Waldrup argues the trial court erred by denying his Motion to Dismiss Court-Appointed Counsel and to replace him with an attorney who would follow Waldrup's directions. Waldrup asserts this violated his Sixth Amendment right to counsel and Fourteenth Amendment right to due process. Specifically, he argues that he brought the matter to the trial court's attention, by showing at a hearing there was good cause given a "complete breakdown in communication[] and irreconcilable conflict[.]" He complains that his appointed counsel failed to help him prepare motions to recuse, failed to investigate, and failed to argue his concerns about "witness intimidation/tampering."

At various times throughout the proceedings, Waldrup wanted appointed counsel and then also said he desired to represent himself and waived counsel, and he also stated he wanted to retain his own attorney. After being appointed counsel in November 2019, Waldrup signed a waiver of counsel on February 27, 2020, and the trial court admonished him several times about proceeding *pro se*. Waldrup proceeded *pro se* in the trial court until March 1, 2021, when a jury panel was assembled for voir dire and trial was scheduled to begin. The trial court held a hearing to address pretrial motions prior to voir dire, including Waldrup's Motion

45

for Continuance. When the trial court denied Waldrup's Motion for Continuance, Waldrup withdrew his waiver of counsel and said he wanted to retain an attorney, but alternatively requested appointed counsel. The trial court released the panel. The trial court then allowed Waldrup a week to retain a lawyer and explained if he could not, she would make an indigency finding and appoint counsel. On March 10, 2021, the trial court appointed counsel.

On May 10, 2021, Waldrup filed a Motion to Dismiss Court-Appointed Counsel, and on May 17, 2021, the trial court held a hearing on the Motion. At the hearing, Waldrup said he did not wish to proceed *pro se* but asked the trial court to appoint someone who would follow his instructions and complained appointed counsel was "not truly being zealous in his efforts to pursue my defensive theories and the direction that I repeatedly requested for [him] to go." Appointed counsel also explained his position on the strategy Waldrup asked him to employ. Appointed counsel explained that Waldrup

> has filed many motions and continues to draft motions and file them and wants me to adopt those and argue those and I have argued one or two of the motions he has filed, but the others I'm not going to adopt and argue and that has caused a problem. We have a difference of opinion about the law and the benefits that he can get from those motions and so because of that, he basically doesn't respect my opinion of the law and would ask for a new attorney[.]

46

The trial court noted, "I'm hearing a difference of opinion as to how your case should proceed as to your defensive theories and as to possible trial strategy[,]" and ultimately denied Waldrup's request to appoint new counsel.

We review a trial court's ruling on a motion to dismiss appointed counsel for an abuse of discretion. *See Solis v. State*, 792 S.W.2d 95, 100 (Tex. Crim. App. 1990) (stating that "[a]ppointment of new counsel is a matter solely within the discretion of the trial court"); *see also King v. State*, 29 S.W.3d 556, 566 (Tex. Crim. App. 2000) (noting that allowing an attorney to withdraw is in trial court's discretion). The Sixth Amendment and the Due Process Clause of the Fourteenth Amendment guarantee a criminal defendant's right to counsel. *See Thomas v. State*, 550 S.W.2d 64, 67 (Tex. Crim. App. 1977). This does not grant a defendant the right to appointed counsel of his choice. *See id.* at 68. Appointed counsel may be replaced for good cause. *See* Tex. Code Crim. Proc. Ann. art. 26.04(j)(2). "The trial court is under no duty to search for a counsel until an attorney is found who is agreeable to the accused." *Solis*, 792 S.W.2d at 100 (citations omitted). "[P]ersonality conflicts and disagreements concerning trial strategy are typically not valid grounds for withdrawal." *King*, 29 S.W.3d at 566; *Solis*, 792 S.W.2d at 100.

This record established that Waldrup was unhappy because appointed counsel failed to pursue Waldrup's desired motions and defensive theories; they disagreed on the law and the benefits that would be gleaned from pursuing Waldrup's motions.

47

In essence, as the trial court recognized, appointed counsel and Waldrup disagreed about trial strategy, which is typically not a valid basis for withdrawal. *See King*, 29 S.W.3d at 566; *Solis*, 792 S.W.2d at 100. We conclude the trial court did not abuse its direction in denying Waldrup's Motion to Dismiss Court-Appointed Counsel and appoint new counsel. We overrule issue ten.

Issue Eleven: Denial of Motion to Dismiss Based on Prosecutorial Misconduct

In his eleventh issue, Waldrup complains the trial court erred by denying his Motion to Dismiss based on "outrageous prosecutorial misconduct" after his case was reindicted. Waldrup was originally indicted for possession of a controlled substance with intent to deliver, a first-degree felony, with two enhancements. *See* Tex. Health & Safety Code Ann. § 481.112(a), (d). On October 6, 2020, Waldrup was reindicted for simple possession, eliminating the intent to deliver element. *See id.* § 481.115(d). The reindictment included two enhancement paragraphs. Waldrup purportedly filed a civil lawsuit in federal court the same day for civil rights violations alleging there was no probable cause determination within forty-eight hours of his arrest, so his detention was unlawful.

Shortly before trial, Waldrup filed a pro se Motion to Dismiss for Outrageous Prosecutorial Misconduct complaining of the reindictment. In the Motion, Waldrup complained that he was "selectively and vindictively" prosecuted to deter him from exercising his First Amendment rights in a civil rights suit he filed in federal court

against the Montgomery County Sheriff's Department and Montgomery County's District Attorney's Office. He also alleged he was "singled out for prosecution because he is an indigent African American, represented by Court-Appointed Counsel…and because of the State's desire to prevent him from exercising his Constitutionally protected rights in violation of the First, Fifth, and Fourteenth Amendments to the United States Constitution Due Process, and Equal Protection of the Law Clauses." At the hearing on the Motion to Dismiss, Waldrup admitted the reindictment as evidence and a notice sheet from a federal court filing dated October 7, 2020, showing that he filed a civil lawsuit on October 6, 2020. The notice sheet lacks any specifics regarding the time of day the lawsuit was filed, and it does not show that the State received notice of the lawsuit. Waldrup did not call any witnesses to testify at the hearing.

> In the hearing on Waldrup's motion, the State responded that Waldrup's
>
> argument assumes the District Attorney's Office or the prosecutors or representatives of the State were aware of his civil suit on the day that he filed it. And in addition to that, the re-indictment not only was a lower offense, reduced to 2nd degree, but also eliminated an element of the offense for the State to prove at trial. And that would be the intent to manufacture or deliver. Strategic trial reasons was [sic] a cause of the re-indictment. And I can't say that . . . the State was even aware of a civil suit at that point.

Under Texas law, prosecutors have broad discretion in deciding which cases to prosecute, including whether to prosecute and what charge to file. *See Neal v. State*, 150 S.W.3d 169, 173 (Tex. Crim. App. 2004) (citations omitted). We must

49

presume criminal prosecutions are "undertaken in good faith and in nondiscriminatory fashion[.]" *Id.* If, however, criminal charges are brought in retaliation of a defendant's exercise of his legal rights, that decision to prosecute violates due process. *See id.*

> A constitutional claim of prosecutorial vindictiveness may be established in either of two distinct ways: 1) proof of circumstances that pose a "realistic likelihood" of such misconduct sufficient to raise a "presumption of prosecutorial vindictiveness," which the State must rebut or face dismissal of the charges; or 2) proof of "actual vindictiveness"—that is, direct evidence that the prosecutor's charging decision is an unjustifiable penalty resulting solely from the defendant's exercise of a protected legal right.

*Id.* (quoting *U.S. v. Johnson*, 171 F.3d 139, 140–41 (2d Cir. 1999); *U.S. v. Goodwin*, 457 U.S. 368, 380–81 (1982)). The presumption applies in "very few situations" and "can be overcome by objective evidence in the record justifying the prosecutor's action." *Id.* at 173–74. Although not applicable here, a recognized situation in which the presumption of vindictiveness applies is when a defendant proves "he was convicted, he appealed and obtained a new trial, and that the State thereafter filed a greater charge or additional enhancements." *Id.* at 174. Even a prosecutor's excuse of "mistake or oversight" is an "objective explanation" that can be sufficient to rebut a presumption of prosecutorial vindictiveness especially if a prosecutor does not merely deny his state of mind was motivated by vindictiveness. *Hood v. State*, 185 S.W.3d 445, 450 (Tex. Crim. App. 2006).

Waldrup seems to argue the presumption of vindictiveness applies, since his cited authority addressed the presumption, and he asserts the State "failed to overcome the presumption[.]" He contends the fact that the case was reindicted on the same day that he filed a federal lawsuit for civil rights violations meant that the State reindicted him for filing the lawsuit. We disagree. First, Waldrup didn't suffer a conviction, appeal and obtain a new trial, and show he was reindicted, evidence of the sort that in the first instance would be required to raise the presumption of vindictiveness on which his theory seems to rely. Second, his contention presupposes that the prosecution had notice of his federal lawsuit before he was reindicted. While the evidence established that Waldrup filed a civil suit on October 6, 2020, there is no indication what time the suit was filed. It may have been filed before the reindictment or after the reindictment was filed. Additionally, the notice itself was dated October 7, 2020, and stated, "Your case has been filed as a Prisoner Civil Rights Complaint." The face of the document reveals the notice was sent to Waldrup, and he did not offer proof at the hearing that it was ever sent to the State before the reindictment. Finally, the reindictment did not contain a greater charge or increase his punishment range. *See Neal*, 150 S.W.3d at 174. Rather, it reduced the charge from a first-degree felony to a second-degree felony, and the added enhancements made the applicable punishment range identical to the original indictment. So, we conclude the presumption of vindictiveness does not apply. That

51

said, the State offered objective evidence that by reducing the charge to simple possession, the reindictment eliminated one element (intent) it would have to prove at trial, but the enhancements meant the same punishment range applied and the reindictment was a strategic decision. On this record, the only evidence shows the prosecutor's decision was a matter of trial strategy as it relates to the State's burden of proof. Stated another way, Waldrup presented no evidence the State had a vindictive motive in reindicting him on a reduced charge. *See Hood*, 185 S.W.3d at 450; *Neal*, 150 S.W.3d at 174. We overrule issue eleven.

Issues Twelve and Thirteen: Self-Representation and Motion to Quash Indictment

In issue twelve, Waldrup contends the trial court violated his right to self-representation by delaying a *Faretta* hearing. Waldrup claims that he asserted his right to self-representation on November 18 and December 9, 2019, but he did not sign a waiver of counsel until February 27, 2020. Specifically, he argues that the delay between asserting his rights and the *Faretta* hearing effectively denied his right to self-representation. We do not have the benefit of a Reporter's Record for the dates he claims he asserted his right to self-representation. There are notations on a scheduling order in the Clerk's Record that reflect a *Faretta* hearing needed to be scheduled.

"[T]he Sixth and Fourteenth Amendments include a 'constitutional right to proceed *without* counsel when' a criminal defendant 'voluntarily and intelligently

52

elects to do so.'" *Indiana v. Edwards*, 554 U.S. 164, 170 (2008) (quoting *Faretta v. California*, 422 U.S. 806, 807 (1975) (emphasis original)). "[T]he right of self-representation does not attach until asserted." *Brown v. Wainwright*, 665 F.2d 607, 610 (5th Cir. 1982) (citations omitted). A defendant's request to forgo counsel and represent himself must be "clear and unequivocal." *Faretta*, 422 U.S. at 835. To ensure protection of the fundamental right to counsel, "courts indulge every reasonable presumption against waiver of counsel." *Jordan v. State*, 571 S.W.2d 883, 884 (Tex. Crim. App. 1978) (citing *Johnson v. Zerbst*, 304 U.S. 458 (1938)) (other citations omitted). While we recognize that courts should not unduly defer ruling on a firm request by a defendant to represent himself, we are unaware of any rule that requires a *Faretta* hearing to occur within any specific timeframe, nor has Waldrup pointed us to any such authority. *See Brown*, 665 F.2d at 612 (noting its decision should not be read to imply a trial court may unduly defer ruling on firm request by a defendant to represent himself hoping he will change his mind).

There is no reporter's record showing Waldrup unequivocally asserted his right to self-representation before signing the waiver of counsel on February 27, 2020. The record is silent about the reasons for any delay. A careful review of his argument reveals that he apprised his court-appointed counsel of his desire to represent himself, not the court. Further, beyond notations on a scheduling order, there is nothing to suggest the context of Waldrup's statements, or that he had been

53

admonished and effectively waived his right to counsel. Once Waldrup signed the waiver of counsel, which occurred less than two months after he was indicted and more than a year before trial, the trial court permitted him to represent himself. He was allowed to file motions and attend hearings on those motions during the proceedings.

He complains that he was harmed given the delay in the *Faretta* hearing, which denied him the opportunity to "request an examining trial" prior to being indicted. *See* Tex. Code Crim. Proc. Ann. art. 16.01 (providing for an examining trial in felony cases). The purposes of an examining trail are to: (1) determine whether sufficient evidence of guilt supports holding a suspect accused of criminal conduct; (2) to determine if bail should be allowed and if so, the amount; and (3) to get the testimony of witnesses, including any voluntary statement a suspect wishes to make. *State ex rel. Holmes v. Salinas*, 784 S.W.2d 421, 424 (Tex. Crim. App. 1990) (citations omitted). After the grand jury returns an indictment, the question of whether probable cause exists and the necessity of an examining trial becomes moot. *See Russell v. State*, 604 S.W.2d 914, 921 n.12 (Tex. Crim. App. [Panel Op.] 1980) (explaining that once a grand jury returns indictment, the purpose and justification for the examining trial have been accomplished); *Rodriguez v. State*, No. 05-14-01225-CR, 2015 WL 8729283, at *3 (Tex. App.—Dallas Dec. 11, 2015, no pet.) (mem. op., not designated for publication) (noting that question of sufficient

54

evidence at examining trial "was rendered moot after grand jury returned the indictment"). The return of an indictment terminates the right to an examining trial. *State ex rel. Holmes*, 784 S.W.2d at 424. The record established that the magistrate made a probable cause determination, despite Waldrup's assertion to the contrary. Later, a Montgomery County grand jury indicted him. Based on this record, he was not entitled to an examining trial, and the delay in conducting the *Faretta* hearing was harmless. *See* Tex. R. App. P. 44.2(b). We overrule issue twelve.

In issue thirteen, his last issue, Waldrup argues the trial court erred by denying his Amended Motion to Quash the Indictment without a hearing. The record shows that the Amended Motion to Quash referenced in his brief and filed on May 27, 2020, pertained to the original indictment in which he was charged with the first-degree felony offense of possession with intent to deliver in an amount greater than four grams but less than 200 grams. On October 6, 2020, a different grand jury reindicted Waldrup for the second-degree felony offense of possession of a controlled substance in an amount greater than four grams but less than 200 grams—the offense he was tried and convicted of. The record does not reflect that Waldrup filed a Motion to Quash after he was reindicted.

A trial court *may* set any criminal case for a pretrial hearing, including exceptions to the form or substance of the indictment. *See* Tex. Code Crim. Proc. Ann. art. 28.01 § 1(4) (emphasis added). We review a trial court's decision to rule

55

on a motion to quash without a hearing for an abuse of discretion. *See Hicks v. State*, 508 S.W.2d 400, 403 (Tex. Crim. App. 1974) (citing Tex. Code Crim. Proc. Ann. art. 28.01); *Rodriguez v. State*, 491 S.W.3d 18, 26 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd). Generally, a trial court is not required to hold a hearing on a motion to quash, and a trial court's decision to hold such a hearing is left to its sound discretion. *See Hicks*, 508 S.W.2d at 403; *Rodriguez*, 491 S.W.3d at 26. On this record, we cannot say the trial court abused its discretion by failing to hold a hearing on Waldrup's Amended Motion to Quash the original indictment. *See Hicks*, 508 S.W.2d at 403; *Rodriguez*, 491 S.W.3d at 26. His Amended Motion to Quash addressed the original indictment, and that is not the charge for which he was convicted. Thus, the error, if any, for failing to hold a hearing on his Amended Motion to Quash is harmless. *See* Tex. R. App. P. 44.2(b) (any error that does not affect substantial rights must be disregarded). We overrule issue thirteen.

## CONCLUSION

Having overruled each of Waldrup's issues, we affirm the trial court's judgment.

AFFIRMED.

                                       _____

                                                 W. SCOTT GOLEMON
                                                     Chief Justice

Submitted on May 16, 2023
Opinion Delivered June 21, 2023
Do Not Publish

Before Golemon, C.J., Horton and Johnson, JJ.