

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-1221-12

**THE STATE OF TEXAS**

**v.**

**TONY TYRELL BETTS, Appellee**

**ON THE STATE'S PETITION FOR DISCRETIONARY REVIEW
FROM THE TENTH COURT OF APPEALS
NAVARRO COUNTY**

       **HERVEY, J., delivered the opinion of the Court in which KELLER, P.J., MEYERS, WOMACK, JOHNSON, KEASLER, COCHRAN, and ALCALA, JJ., joined. Price, J., joined parts I, II, IV, V, and VI and filed a concurring opinion.**

## O P I N I O N

       Appellee, Tony Tyrell Betts, was indicted for cruelty to animals. *See* TEX. PENAL CODE § 42.09. The trial court granted Appellee's motion to suppress, which complained of a warrantless search and seizure. The Waco Court of Appeals affirmed the trial court's order. *State v. Betts*, No. 10-11-00419-CR, 2012 Tex. App. LEXIS 6703 (Tex.

App.—Waco Aug. 9, 2012) (memo. op., not designated for publication). We granted the State's petition for discretionary review, and we will affirm the judgment of the court of appeals.

**I. FACTS**

Appellee was arrested and indicted for the felony offense of cruelty to animals after law enforcement officers seized approximately thirteen of his dogs that were located on the property of his aunt, Deanna Hall, in Kerens, Texas. *See* TEX. PENAL CODE § 42.09. Appellee filed a motion to suppress, complaining of the warrantless search and seizure. He alleged that all evidence seized in connection with his case should be suppressed because the Kerens Police Department violated his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United State Constitution; Article I, Section 9, of the Texas Constitution; and Article 38.23 of the Texas Code of Criminal Procedure.

At the hearing on the suppression motion, County Commissioner Dick Martin testified that, on April 27, 2011, he was delivering food for Meals on Wheels to a private residence when he noticed a number of dogs in the street. He mentioned the dogs to the recipient of the meal, who complained that the dogs came into her yard to relieve themselves. After leaving the residence, Martin reported the dogs to City Hall. On cross-examination, Martin stated that he had made prior reports to the city about dogs tied up in a backyard in the same area.

Animal Control Officer Randy Featherston testified that he received a call concerning animals fighting and responded to 108 NE 4th Street. When he arrived, he heard a puppy yelping. Featherston entered the property to investigate and found the puppy, which was stuck under a fence. He pushed the puppy back under the fence and into the pen where he could not get out and run free. Featherston testified that he could not see the pen that the puppy was in from the residence's driveway, but it was visible from the street. Featherston also stated that, while in the backyard, he observed that every dog on the property was malnourished. He described that the dogs were chained, there was no visible food, and there was only dirty water to drink. Featherston testified that he thought something needed to be done to take care of the animals, so he called for assistance from the Kerens Police Department.

Kerens Chief of Police Bryan Miers,[1] along with Peace Officers Roy Ivey and Bennito Monteagudo, responded to Featherston's request for assistance. Miers testified that he could see the dogs from the roadway, before he entered the property. The dogs were located between 60 and 70 yards from where he was standing. He stated that he observed several adult dogs tied to chains and a pen holding puppies. All of the dogs were skinny and appeared to be malnourished and in poor overall health, especially the puppies, which appeared almost lifeless. On cross-examination, Miers explained that he entered the property because he had "reasonable suspicion to believe that the dogs were in

---

[1]We note that the name of the Kerens Chief of Police is spelled both Meirs and Miers in the record.

immediate danger" based upon his own visual observation and information relayed from Featherston. Thirteen dogs were seized and turned over to the humane society.

Deanna Hall testified that she is the owner of the property where the dogs were seized (108 NE 4th St.). Hall explained that Appellee is her nephew. Appellee had previously lived with her, and after he moved, she continued to give him permission to keep his dogs on her property. Appellee cared for the dogs daily, but if there was a time when he could not make it to the house, Hall would feed them instead. Hall testified that she did not give consent to the officers to enter her property, and she did not know about their presence at her house until she returned home that evening.

Appellee testified that he housed his dogs in his aunt's backyard with her permission because he resides in a nearby apartment with no yard or holding facility for the dogs. He stated that the dogs were housed approximately 65-70 yards from the street. Like Hall, he testified that he did not provide consent for the officers to enter the property and seize his dogs.

The trial court granted Appellee's motion to suppress. In response to the State's motion for findings of fact and conclusions of law, the trial court entered findings of fact and conclusions of law. The trial court found, among other things, that Chief Miers and Officers Featherston and Ivey viewed, from the street, dogs in the backyard that appeared to be malnourished, "[n]o evidence was presented indicating the dogs were in danger of death or inflicting death or serious bodily injury on any human," and "[t]he dogs were

housed approximately 70 yards from the street where they could be viewed without entering on to the property." The trial court also made the following conclusions:

1.  The Defendant had a reasonable expectation of privacy.
2.  The Defendant's property was searched by agents of the State without a warrant.
3.  Neither the Defendant nor Hall gave consent to the animal control officer or the police officers to come into the backyard of the residence where the dogs were living.
4.  The backyard where the dogs were housed and seized is curtilage of the residence and thus is afforded the same 4th Amendment protections as the residence.
5.  There were no exigent circumstances present in this case which would be an exception to the warrant requirement.
6.  The Court's ruling granting the motion to suppress should be affirmed.

## II. WACO COURT OF APPEALS

On direct appeal, the State argued that the trial court erred in granting the motion to suppress because Appellee had no standing to complain about the search and seizure and because the dogs were in plain view of the officers. The Waco Court of Appeals disagreed and affirmed the trial court's order granting the motion to suppress. *Betts*, 2012 Tex. App. LEXIS 6703.

The court of appeals first determined that Betts had a reasonable expectation of privacy, noting that the animals seized were Betts' property, Betts had previously lived at the residence and continued to keep his dogs there with his aunt's permission, and there were structures and a pen to house the dogs. *Id.* at *3-5. The court then concluded that the criminal activity of animal cruelty was not in the plain view of officers from the street.

*Id*. at *5-7. The court found that Officer Featherston heard a puppy yelping after he was already on the property and observed the condition of the dogs when he walked to the back of the property. And although Chief Miers testified that he could see the dogs from the street, the court discounted this statement because the dogs were housed approximately seventy yards from the street and Chief Miers had also testified that Featherston informed him of the condition of the dogs.

We granted the State's petition for discretionary review to address the following issues:

> 1. Does an accused have standing to challenge a search and seizure conducted in a relative's backyard where he had permission to house dogs when he did not live at the house and the yard was entirely exposed to the public?
>
> 2. Did the majority of the court of appeals improperly ignore the trial court's dispositive factfinding in ruling that the search and seizure was not justified under the plain view doctrine?
>
> 3. Did the majority err by failing to follow the mandates of *State v. Elias*, 339 S.W.3d 667 (Tex. Crim. App. 2011), and remand the case to the trial judge to make fact findings and legal conclusions on the issue of whether entry onto the property was justified under the community caretaking doctrine?

### III. STANDING

The State's first ground for review contests Appellee's standing to challenge the search and seizure that were the subject of the motion to suppress. The Fourth Amendment of the U.S. Constitution and Article I, Section 9, of the Texas Constitution protect individuals from unreasonable searches and seizures. *Richardson v. State*, 865

S.W.2d 944, 948 (Tex. Crim. App. 1993). The rights secured by the Fourth Amendment and Article I, Section 9, are personal, and accordingly, an accused has standing to challenge the admission of evidence obtained by an "unlawful" search or seizure only if he had a legitimate expectation of privacy in the place invaded. *Rakas v. Illinois* 439 U.S. 128, 139, 143 (1978); *Richardson*, 865 S.W.2d at 948-49. The defendant who challenges a search has the burden of proving facts demonstrating a legitimate expectation of privacy. *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996). He must show that he had a subjective expectation of privacy in the place invaded and that society is prepared to recognize that expectation of privacy as objectively reasonable. *Id*.; *see Smith v. Maryland*, 442 U.S. 735, 740 (1979).

In considering whether a defendant has demonstrated an objectively reasonable expectation of privacy, we examine the totality of the circumstances surrounding the search, including

> (1) whether the accused had a property or possessory interest in the place invaded; (2) whether he was legitimately in the place invaded; (3) whether he had complete dominion or control and the right to exclude others; (4) whether, before the intrusion, he took normal precautions customarily taken by those seeking privacy; (5) whether he put the place to some private use; and (6) whether his claim of privacy is consistent with historical notions of privacy.

*Granados v. State*, 85 S.W.3d 217, 223 (Tex. Crim. App. 2002); *Villarreal*, 935 S.W.2d at 138. This is a non-exhaustive list of factors, and no one factor is dispositive. *Granados*, 85 S.W.3d at 223. "Although we defer to the trial court's factual findings and view them

in the light most favorable to the prevailing party, we review the legal issue of standing de novo." *Kothe v. State*, 152 S.W.3d 54, 59 (Tex. Crim. App. 2004).

The record supports the trial court's conclusion that Appellee had a reasonable expectation of privacy. The property where the search and seizure occurred was owned by Deanna Hall. While he no longer lived at the residence, Appellee had permission from his aunt to keep his dogs in the backyard and to enter the premises in order to water and feed his dogs, which he did on a daily basis.[2] The backyard was fenced on three sides with two-wire fencing, and the fourth side was enclosed by the neighbor's wood privacy fence. The dogs were kept approximately 70 yards from the road, behind the house, in a central part of the back yard. Some of the dogs were chained to the ground near dog-house structures, and others were in pens surrounded by chainlink. Certainly the housing and shelter of animals is a common private use for one's backyard.

We recognize that Appellant did not have an ownership interest in the property, but that is just one factor to consider and not a requirement for a person to have standing to challenge improper police actions. *See*, *e.g.*, *Brendlin v. California*, 551 U.S. 249 (2007) (holding that passengers of a vehicle, which they did not own, had standing to challenge the validity of a traffic stop); *Minnesota v. Olsen*, 495 U.S. 91 (1990) (holding

---

[2]In *Wilson v. State*, we explained that "[i]f the owner of a vehicle has turned it over to another person for some period of time, then surely this latter person has standing vis-a-vis the car during the duration of the bailment." 692 S.W.2d 661 (Tex. Crim. App. 1985) (quoting 3 W. LaFave, Search and Seizure § 11.3, at 576-77 (1978)). Although referring specifically to vehicles, the underlying concept is equally applicable to the instant case.

that an overnight guest has a legitimate expectation of privacy in his host's home).

Consequently, based upon the totality of the circumstances, and viewing the evidence in

the appropriate light, the record supports that Appellee had a reasonable expectation of

privacy in his aunt's backyard.

The State relies on several United States Supreme Court cases to argue that there is

no reasonable expectation of privacy in the backyard because it was exposed to public

view,[3] but those cases are not controlling here. In *Katz*, the Supreme Court did state that

"what a person knowingly exposes to the public, even in his own home or office, is not a

subject of Fourth Amendment protection," but the Court went on to hold that government

surveillance of a public phone booth violated the Fourth Amendment, despite the public

and transparent nature of the booth. *Katz v. United State*s, 389 U.S. 347, 351 (1967).

Although other Supreme Court cases have used language similar to that in *Katz*, none of

those cases specifically addresses standing. And in each case, while the officers did not

need a warrant to view areas from the air, the information observed, without more, was

not enough to justify a warrantless search or seizure of the property. *See*, *e.g.*, *Florida v.*

*Riley*, 488 U.S. 445, 449-52 (1989) (plurality op.) (reversing the trial court's grant of a

motion to suppress contesting the search of a greenhouse in a residential backyard

conducted pursuant to a warrant, which was obtained based upon observations gained

---

[3]*See*, *e.g.*, *Florida v. Riley*, 488 U.S. 445, 449-52 (1989) (plurality op.); *Dow Chemical v. United States*, 476 U.S. 227, 239 (1986); *California v. Ciraola*, 476 U.S. 207, 215 (1986); *Katz v. United States*, 389 U.S. 347, 351 (1967).

from helicopter surveillance, because the helicopter surveillance did not constitute a search under the Fourth Amendment); *Dow Chemical v. United States,* 476 U.S. 227, 239 (1986) (holding only that "the taking of aerial photographs of an industrial plant complex from navigable airspace is not a search prohibited by the Fourth Amendment"); *California v. Ciraola*, 476 U.S. 207, 215 (1986) (holding that the Fourth Amendment "does not require the police traveling in the public airways at this altitude to obtain a warrant in order to observe what is visible to the naked eye").[4]

The State also argues, relying on *Villarreal*, 935 S.W.2d at 137, that Appellee did not retain any expectation of privacy in his aunt's house because of his status as a guest, but this case is different from *Villarreal*. In *Villarreal*, the appellant was an invited guest who spent a couple of hours in the residence for a business transaction. We held that the appellant, "who has no possessory or proprietary interest in the premises, but is a guest, has no clothes in the house, or other belongings, has no legitimate privacy interest in the premises searched." *Id.* In contrast to that case, the premises at issue here is the backyard, rather than the residence. Moreover, Appellee was given daily access to and

---

[4]The State also cites *United States v. Santana*, 427 U.S. 38, 42 (1976), but that case is clearly distinguishable. In *Santana*, a suspect in the front doorway of her home "was not in an area where she had any expectation of privacy." *Id.* The Supreme Court explained that, under cases interpreting the Fourth Amendment, a person standing in the threshold of her dwelling is in a "public" place where she does not have any expectation of privacy. *Id.* In contrast, in this case, the dogs were located in the curtilage of the house, which is protected by the Fourth Amendment. *See Oliver v. United States*, 466 U.S. 170, 180 (1984); *see also Gonzalez v. State*, 588 S.W.2d 355, 360 (Tex. Crim. App. 1979) (describing curtilage as the land immediately surrounding and associated with the house).

from the yard to care for his dogs, the dogs were Appellee's personal property, the dogs were kept in pens and near dog houses in the yard. This arrangement was made because Appellee had previously lived in the residence but had moved to a nearby apartment with no yard or holding facility for the dogs.

Therefore, the record supports that Appellee has standing to challenge the search and seizure conducted in his aunt's backyard.

## IV. DEFERENCE TO THE TRIAL COURT AND

## THE PLAIN VIEW DOCTRINE

The State next argues that the court of appeals improperly ignored the trial court's dispositive fact finding in ruling that the search and seizure was not justified under the plain view doctrine. Specifically, the State argues that the court of appeals failed to give the requisite deference to the trial judge's fact finding when it concluded that "it is not clear that Chief Miers could observe the condition of the dogs from the street." *See Betts*, 2012 Tex. App. LEXIS 6703, at *6-7. For that reason, the State contends that the court of appeals's plain view ruling should be reversed.

Appellate courts should afford almost total deference to a trial court's determination of historical facts supported by the record, especially when the trial court's fact findings are based on an evaluation of credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). The same amount of deference should be given to "mixed questions of law and fact," if the resolution of those questions turns on

an evaluation of credibility and demeanor. *Id.* Appellate courts may review de novo "mixed questions of law and fact" not falling within that category. *Id.*

The trial judge found that Miers "witnessed from the street dogs that appeared to be chained and malnourished in the backyard," and this is supported by the record. Miers testified that he could see the dogs from the roadway, before he entered the property. He testified that he observed that all of the dogs were skinny and appeared to be malnourished and in poor overall health. Because the trial court's finding is supported by the record, the court of appeals failed to properly defer to that finding when it concluded that "it is not clear that Chief Miers could observe the condition of the dogs from the street." *See Betts*, 2012 Tex. App. LEXIS 6703, at *6-7.

However, even giving proper deference, the suggestion that the seizure was justified by the plain-view doctrine is without merit. While searches conducted without a warrant are per se unreasonable, seizing contraband in plain view does not run afoul of the Fourth Amendment. *Walter v. State*, 28 S.W.3d 538, 541 (Tex. Crim. App. 2000). "The 'plain view' doctrine permits an officer to seize contraband which he sees in plain sight or open view if he is lawfully where he is." *DeLao v. State*, 550 S.W.2d 289, 291 (Tex. Crim. App. 1977). Thus, three requirements must be met to justify the seizure of an object in plain view:

> First, law enforcement officials must lawfully be where the object can be "plainly viewed." Second, the "incriminating character" of the object in plain view must be "immediately apparent" to the officials. And third, the officials must have the right to access the object.

*Keehn v. State*, 279 S.W.3d 330, 335 (Tex. Crim. App. 2009) (citations omitted).

In *Keehn*, law enforcement officials properly approached a van parked in the appellant's driveway, and through the window, they could plainly see a propane tank containing anhydrous ammonia, which is used in manufacturing methamphetamine. The officers entered the van and seized the tank without a warrant. In discussing the third requirement of the plain view doctrine, we stated,"Plain view, in the absence of exigent circumstances, can never justify a search and seizure without a warrant when law enforcement officials have no lawful right to access an object." *Id.* Thus, the plain-view doctrine alone could not justify entry into the van to seize the tank. That doctrine would justify the seizure only if the search by which the officers entered the van and obtained access to the tank was rendered reasonable by some other rule. *Id*. We concluded that the vehicle exception to the search warrant requirement supported the entry into the van and access to the tank—after observing the contents of the van through the window, the officers had probable cause to believe that contraband was aboard, and consequently, the automobile exception gave the officers the right to enter the van and seize the tank. *Id.* at 335-36.

In the instant case, the record supports the fact that the officers could plainly view the dogs from the street. However, the fact that officers could see the dogs from afar does not mean that they were entitled to go onto the property and seize the dogs without a warrant, at least in the absence of some other exigency. *See id.* at 335. The officers did

not have a lawful right to go into the yard and seize the dogs.  Appellee's dogs were kept in the backyard of his aunt's home, that is, within the residence's curtilage.  The curtilage of a house is protected by the Fourth Amendment.  *Oliver v. United States*, 466 U.S. 170, 180 (1984); *see Gonzalez v. State*, 588 S.W.2d 355, 360 (Tex. Crim. App. 1979) (describing curtilage as the land immediately surrounding and associated with the house). The officers did not have a warrant to enter the yard, and the State does not argue that an exception to the warrant requirement existed.  Therefore, the police were not authorized by the plain view doctrine to make a warrantless entry into the yard to seize the dogs.

## V. THE COMMUNITY CARETAKING DOCTRINE

In its final ground for review, the State argues that, if there was no plain view from the street, community caretaking is an issue that should be addressed, and the court of appeals should be ordered on remand to require the trial court to make findings and conclusions on this issue.  *See Elias*, 339 S.W.3d 667 ("[T]he omission of findings and conclusions with respect to this potentially dispositive fact issue constitutes a 'failure . . . to act' for purposes of Rule 44.4 of the Rules of Appellate Procedure.").

Once Appellee established standing in the premises to be searched and that the search was conducted without a warrant, he satisfied his burden of establishing his Fourth Amendment claim, and the burden shifted to the State to establish an exception to the warrant requirement.  *See Amador v. State*, 221 S.W.3d 666, 672-73 (Tex. Crim. App. 2007); *Bishop v. State*, 85 S.W.3d 819, 822 (Tex. Crim. App. 2002).  The State did not

present the community caretaking argument during the motion to suppress or on appeal. "[I]n cases in which the State is the party appealing, the basic principle of appellate jurisprudence that points not argued at trial are deemed to be waived applies equally to the State and the defense." *State v. Mercado*, 972 S.W.2d 75, 78 (Tex. Crim. App. 1998); *see also State v. Steelman*, 93 S.W.3d 102, 107 (Tex. Crim. App. 2002). Because the community caretaking function was not a theory argued by the State at trial or to the court of appeals, the State cannot here rely on that theory to prove that the trial court's ruling should be reversed by this Court.[5] *See Steelman*, 93 S.W.3d at 107.

## VI. CONCLUSION

Appellee had standing to contest the warrantless search and seizure conducted in his aunt's backyard. The search and seizure were not justified by the plain view doctrine, and the State cannot rely on the community caretaking doctrine, which it did not raise to the trial court or the court of appeals. Accordingly, the judgment of the court of appeals is affirmed.

Hervey, J.

Delivered: April 17, 2013

Publish

---

[5]The present case in which the State seeks to **reverse** the trial court's ruling is distinguishable from a case such as *Mahaffey v. State*, 316 S.W.3d 633 (Tex. Crim. App. 2010). There, the State could present a new argument for first time on petition for discretionary review because "an appellate court will **uphold** the trial court's ruling if that ruling is 'reasonably supported by the record and is correct on any theory of law applicable to the case.'" *Id.* at 637 (emphasis added).