

## Fourth Court of Appeals
### San Antonio, Texas

### MEMORANDUM OPINION

No. 04-24-00188-CR

Aaron **LEE**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 186th Judicial District Court, Bexar County, Texas
Trial Court No. 2023CR2835
Honorable Kristina Escalona, Judge Presiding

Opinion by:    Irene Rios, Justice

Sitting:        Irene Rios, Justice
               H. Todd McCray, Justice
               Velia J. Meza, Justice

Delivered and Filed: September 30, 2025

AFFIRMED

Appellant Aaron Lee appeals both his convictions for murder and aggravated assault with a deadly weapon. *See* TEX. PENAL CODE ANN. §§ 19.02(b)(2), 22.02(a)(2). In four issues, Lee challenges the sufficiency of the evidence to support his convictions and self-defense claim, and he challenges the trial court's denial of his motions to suppress evidence obtained from his vehicle and statements he made during a custodial interrogation. We affirm.

**BACKGROUND**

Lee was indicted for the murder of Ashley Marie Jones and the aggravated assault with a deadly weapon of Jamel Davis when he shot into Davis's Tahoe. Davis was the driver, and Jones was sitting in the front-passenger seat. At trial, Lee claimed self-defense contending that he shot towards Davis because Davis was pointing a gun at him. Multiple bullet holes were discovered in both Davis's Tahoe and Lee's truck and thus it is undisputed that Davis and Lee exchanged gunfire.

The jury rejected Lee's claim of self-defense and found him guilty of murder and aggravated assault with a deadly weapon. Based on the jury's recommendation, the trial court sentenced Lee to thirty-six years in prison for committing murder and two years in prison for committing aggravated assault with a deadly weapon, both sentences to run concurrently. Lee filed a motion for new trial, but it was overruled by operation of law. This appeal ensued.

**SUFFICIENCY OF THE EVIDENCE**

With respect to Lee's first two issues, he argues the evidence is insufficient to prove both of his convictions for murder and aggravated assault with a deadly weapon. However, regarding his sufficiency challenges, Lee specifically contends the evidence supporting them is insufficient to negate his self-defense claim beyond a reasonable doubt. Because the two issues are intertwined, we address them together.

*A. Applicable Law*

1. Elements of Murder and Aggravated Assault with a Deadly Weapon

Under the Penal Code and relevant to the facts of this case, a person commits the offense of murder if he (1) intentionally or knowingly causes the death of an individual, or (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1), (2).

Likewise, with respect to this case and under the Penal Code, a person commits aggravated assault if the person commits assault as defined under section 22.01 of the Texas Penal Code and uses or exhibits a deadly weapon during the commission of the assault. TEX. PENAL CODE ANN. § 22.02(a)(2). A person commits assault under section 22.01 if the person (1) intentionally, knowingly, or recklessly causes bodily injury to another; (2) intentionally, knowingly, or recklessly threatens another with imminent bodily injury; or (3) intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative. *Id*. § 22.01(a).

"A pistol is a deadly weapon per se." *Bell v. State*, 501 S.W.2d 137, 138 (Tex. Crim. App. 1973); *see also* TEX. PENAL CODE ANN. § 1.07(a)(17)(A). "Bodily injury" means physical pain, illness, or any impairment of physical condition. TEX. PENAL CODE ANN. § 1.07(a)(8).

To establish murder, the State must prove the defendant had a "conscious objective or desire" to cause the death or an awareness that the "conduct is reasonably certain to cause" the death. *See id.* § 6.03(a), (b); *see also id*. § 19.02(b)(1), (2). To establish the defendant committed aggravated assault, the State must prove the defendant had either a "conscious objective or desire" to cause bodily injury, an awareness that the "conduct is reasonably certain to cause" bodily injury, or an awareness of "a substantial and unjustifiable risk" that his actions will cause bodily injury but consciously disregards the risk. *See id.* § 6.03(a), (b), (c); *see also id.* § 22.02(a)(2).

### B. Standard of Review

#### 1. Legal Sufficiency

When reviewing the sufficiency of the evidence, we determine whether, "'viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Witcher v. State*, 638 S.W.3d 707,

709–10 (Tex. Crim. App. 2022) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We measure the evidence by the elements of the offense as defined by the hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

This standard coincides with the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. The factfinder may and should draw "reasonable inferences" from the evidence but may not draw conclusions based on "mere speculation." *Hooper v. State*, 214 S.W.3d 9, 15–16 (Tex. Crim. App. 2007).

The factfinder alone judges the evidence's weight and credibility. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). We may not reevaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018). We must presume the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *See id.*; *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012) (reviewing court must not usurp the jury's role by "substituting its own judgment for that of the jury"); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (reviewing court must not sit as thirteenth juror). "Although the parties may disagree about the logical inferences that flow from undisputed facts, where there are two permissible views of the evidence, the [factfinder]'s choice between them cannot be clearly erroneous." *Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006) (internal quotations omitted).

2. Self-Defense

Self-defense is a justification defense to prosecution under section 2.03 of the Texas Penal Code. *See* TEX. PENAL CODE ANN. §§ 2.03, 9.02, 9.31, 9.32. A person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force. *Id*. § 9.31(a). A "reasonable belief" is one that an ordinary and prudent man would hold in the same circumstances as the actor. *Id*. § 1.07(a)(42). The actor's belief that the force was immediately necessary is presumed to be reasonable if the actor did not provoke the person against whom the force was used and was not otherwise engaged in criminal activity. *See id*. § 9.31(a)(1)(C), (2), (3).

In a claim of self-defense justifying a defendant's use of deadly force against another, the defendant bears the burden to produce evidence supporting the defense, while the State bears the burden of persuasion to disprove the raised defensive issues. *Braughton*, 569 S.W.3d at 608. The defendant's burden of production requires him to present some evidence that would support a rational finding in his favor on the defensive issue. *Id*. In contrast, "the State's burden of persuasion is not one that requires the production of evidence; rather it requires only that the State prove its case beyond a reasonable doubt." *Id*. at 608–09 (internal quotations omitted). Thus, in reviewing the sufficiency of the evidence to support a conviction when the jury has rejected a defendant's claim of self-defense, we determine whether, after viewing all the evidence in the light most favorable to the verdict, any rational jury would have found the essential elements of the offense beyond a reasonable doubt and also would have found against the defendant on the self-defense issue beyond a reasonable doubt. *Id*. at 609; *see also Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991).

The issue of self-defense is a fact issue to be determined by the jury, and "'[a] jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory.'" *Braughton*, 569 S.W.3d at 609 (quoting *Saxton*, 804 S.W.2d at 914). Thus, "[d]efensive evidence which is merely consistent with the physical evidence at the scene of the alleged offense will not render the State's evidence insufficient since the credibility determination of such evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence." *Saxton*, 804 S.W.2d at 914; *see also Braughton*, 569 S.W.3d at 609.

*C. Relevant Facts*

More than twenty witnesses testified during Lee's trial. A majority of the witnesses were from the San Antonio Police Department (the "Department"), who testified in various capacities about the Department's investigation into the shooting. However, the crux of how the events transpired that night rests on the witnesses' credibility because Davis's and Lee's testimonies conflict.

Lee and Jones moved to Texas together as a couple and met Davis at the same apartment complex where they lived, and they all became friends. About a month before the shooting that occurred a few days before New Year's Eve, Lee and Jones ended their relationship. Jones moved to a new apartment complex, and Lee stayed at different places, including his grandparents' house located on San Gabriel Street (hereinafter known as the "San Gabriel house"). Both Jones and Davis knew Lee's grandparents and they also spent time at the San Gabriel house, even without Lee. During this time, Lee's, Jones's, and Davis's dogs were all kept at Jones's apartment. Around Christmas Day, Lee borrowed Jones's key to her apartment to take a shower but did not return her key timely, requiring Jones and Davis to break into Jones's apartment to feed and take care of the

dogs. They discovered two of the dogs had gotten into a fight, and this apparently sparked the dispute leading up to the shooting.

Several messages between Lee and Jones and a message between Lee and Davis showed the severity of the dispute concerning Lee not returning Jones's key and the incident with the dogs. There was also testimony about Davis going to Lee's friend's house demanding to see Lee. Davis's account of the encounter with Lee's friend, D.M., differed from that of Lee and D.M. Davis acknowledged being upset about the dogs and wanting to fight Lee when he went to D.M.'s house, but Davis said that when D.M. told him to get off his property, Davis went to the street, stayed for a while, and then left. Contrary to Davis's account, D.M. described Davis as a threatening, enraged man, who D.M. heard cursing and yelling at Lee. D.M. admitted to threatening to shoot Davis if he did not leave his property, but D.M. perceived Davis as a threat. And although Davis left D.M.'s property, D.M. testified Davis stood right outside his property, shaking the fence at times. Lee's story matched D.M.'s account.

Also, prior to the shooting, both Davis and Lee presented evidence claiming each received threats from the other. Lee was told Davis was looking for him and wanted to hurt him, and Davis heard Lee was looking for him with "two guns." The jury also heard testimony that Lee threatened to kill Davis in self-defense if Davis came after him. During the day of the shooting, Davis claimed Lee drove by Jones's apartment complex while Davis was outside, noting that while nothing was said, Davis and Lee saw each other. Lee denied this occurred. Later that night, while Jones and Davis were at the San Gabriel house with Davis's Tahoe parked outside, Davis claimed Lee also drove by that house slowly. Lee testified that he was at a neighbor's house on San Gabriel close to his grandparents' house.

According to Lee, while getting into his truck, he saw Davis walking out of the San Gabriel house; and after Lee asked him, "What's up?" Davis responded by telling Lee something like "You know what's up." Lee then testified he saw Jones wave at him as she was getting into Davis's Tahoe. Because Lee had returned Jones's key and Jones waved at him, Lee thought his dispute with Davis was over. Lee then pulled his truck up parallel to the front-passenger side of the Tahoe to ask Jones about his dogs and watches. After rolling down his window and looking up into the Tahoe, Lee claims Davis was pointing a gun at him. In response, Lee said he threw his hands up and asked Davis whether he was going to shoot him, and Davis replied, "You know you're out here looking for me, and I don't play with my life." Lee disagreed with Davis that he was looking for him, Lee said Davis demanded the money Lee owed Jones. Lee claimed he was scared for his life. Lee then claimed Davis chambered a round, so he immediately grabbed his gun out of a holster sitting on his front seat and began firing at Davis to prevent Davis from killing him. Lee stated Davis shot at him, and Lee drove away.

Next, Lee explained he drove to the house of his friends, K.H. and L.M., taped part of the truck's back window that was broken by a gunshot, then left his truck at their house. Lee stated he got a ride to another friend's house where he left the gun because he said he was terrified and did not know what to do. Lee claimed he took some medication to calm down and then contacted the police later and turned himself in because he felt it was the right thing to do. Lee's trial testimony followed the account he provided in a recorded statement given while in jail.

Davis, on the other hand, provided a different account. According to Davis, as he and Jones were leaving the San Gabriel house and walking to his Tahoe, he saw Lee standing near his truck and told Lee that he had heard Lee was looking for him. Davis said Lee mumbled something. Davis got into the driver's side of his Tahoe and Jones got into the front-passenger seat. Davis

admitted to carrying his gun on him that night, and when he got into his Tahoe, Davis testified he took it off and placed it on top of the center console. Davis then claims Lee got into his truck, which was parked behind his Tahoe, and pulled up next to the front-passenger window of his Tahoe. As Davis was getting ready to drive away, Davis testified Lee told him, "I see you got your gun with you." According to Davis, Lee began talking to Jones telling her to come with him and that he had money for her, but Jones did not want to go with Lee. Davis then told Lee to just give Jones the money to settle matters, but Lee responded by telling Davis it was not his business. Lee then asked Davis who told him that Lee was looking for him, but Davis dismissed the question by stating it did not matter. Lee proceeded to inform Davis that he was "always strapped," and then began shooting at the Tahoe. Davis explained he leaned forward when Lee began shooting, and he was shot in the back. After he was shot, Davis picked up his gun and began shooting back at Lee through his own windshield. Davis testified that Lee fired multiple shots, then began driving away before Davis was able to begin shooting.

Davis said Jones told him that she had been "hit" and began holding her stomach or chest, and he immediately drove them to a nearby hospital. Initially, Davis did not tell police that Lee shot them, but after learning Jones died, Davis told police that Lee was the shooter.

Both K.H. and L.M. testified. Around 3:30 a.m. the night of the shooting, Lee brought his truck to K.H.'s house and told K.H. someone shot at him. Lee asked K.H. if he could leave his truck and keys at K.H.'s house. He also asked K.H. to move the truck to the backyard behind a privacy fence. K.H. noticed bullet holes in the driver's side door and back door, and the back window was shot out. After Lee left, K.H. moved the truck towards the front of the driveway, not to the backyard, and called L.M. to come to the house. After seeing Lee's truck, L.M. called the police to report that a "potential murder vehicle" was in the driveway. K.H. and L.M. gave the

truck's key to the police and told them what they knew about the shooting. K.H. described Lee as distraught and shaken up and told police what Lee told him about the shooting. K.H. expressed that Lee told him he returned fire and emptied his clip after someone shot at him. L.M. also told police he had spoken with Lee on the phone, and Lee told him that he had to shoot because a gun was pulled on him; Lee also told L.M. that Jones was dead. L.M. recorded this conversation and provided it to the police. At the time L.M. called the police, Lee was already a suspect in the shooting.

Detectives observed evidence of seven clustered bullet holes to the front-passenger door and eleven bullet strikes to the windshield on Davis's Tahoe. Additionally, eleven 9mm bullet casings were discovered inside the Tahoe and determined to be shot from Davis's Glock 17 9mm handgun that the police recovered. The State presented evidence that based on the damage to the Tahoe, the trajectory of the bullets to the front-passenger door appear to come from outside of the Tahoe, and the bullet strikes to the windshield appear to be from shots taken inside the Tahoe and through its windshield. None of the damage from the bullet holes on the front-passenger door indicate that shots were fired from inside the Tahoe's front-passenger door.

The damage to the driver's side of Lee's truck included bullet holes and ricochet strikes from bullets that did not enter but bounced off the side of the truck. Lee's truck also had a bullet hole in the tailgate of the truck, and the back window was shattered but had been partially taped. Inside Lee's truck, investigators found a live .40 caliber bullet, a gun holster for a pistol, and duct tape in the center console. There was also a lead projectile embedded in the dashboard indicative of gun activity. Detectives found several .40 caliber bullet casings on the street in front of the San Gabriel house. Lee admitted at trial he used a .40 caliber handgun.

The medical examiner who performed Jones's autopsy reported Jones received two gunshot wounds. The fatal shot was to the right side of her abdomen and chest and traveled through her ribs, striking her diaphragm, liver, adrenal gland, spinal column, pancreas, and spleen before exiting her body. The medical examiner opined the trajectory of the bullet was from right to left through her body at an upward and forward angle that could be explained by either Jones leaning over or being shot by someone who was slightly below her but mostly parallel from where she was sitting.

*D. Analysis*

While Lee challenges the sufficiency of the evidence to prove he committed the essential elements of murder and aggravated assault with a deadly weapon, no one disagrees Lee fired several shots into Davis's Tahoe striking Jones and Davis, causing Jones's death. Lee contends he did not intend or desire to cause Jones's death; however, the jury could have reasonably believed that when Lee opened fire at the Tahoe, Lee was aware that his "conduct [was] reasonably certain to cause" Jones's death. *See* TEX. PENAL CODE ANN. § 6.03(b); *see also id.* § 19.02. Moreover, Lee testified that he purposely shot into the Tahoe in an attempt to shoot Davis. *See id.* §§ 6.03(a), 22.02(a)(2).

Therefore, when viewing the evidence in the light most favorable to the prosecution, we conclude any rational trier of fact could have found that Lee committed the murder of Jones and the aggravated assault of Davis beyond a reasonable doubt. *See Witcher*, 638 S.W.3d at 709–10; *see also Jackson*, 443 U.S. at 319.

Nonetheless, Lee argues the jury should have found that he was justified in using deadly force against Davis, and therefore Jones, because he was acting in self-defense. As the sole judge

of the credibility of the witnesses, the jury was free to disbelieve Lee acted in self-defense. *See Braughton*, 569 S.W.3d at 608.

The jury had sufficient evidence to reject Lee's claim of self-defense. Although Lee's trial testimony and recorded statements support his claim that he acted in self-defense, the jury also heard evidence refuting his self-defense claim. A jury's decision to reject witness testimony must be rational in light of the totality of the record, and any underlying inferences used to reject that testimony must be reasonably based upon the cumulative force of all of the evidence. *See id*. While Lee claimed Davis pointed his gun at him and chambered a bullet before Lee even grabbed his gun and began shooting, Davis testified that it was Lee who raised his gun first, stated he was always "strapped," and fired multiple rounds before Davis could return fire. The jury could have disbelieved the sequence of events in Lee's account of the shooting. Lee testified that when he pulled his truck up parallel to the Tahoe to talk to Jones, Davis already had his pistol pointed at him and ready to fire, but yet Lee was able to grab his gun out of a holster sitting on his front seat and fire multiple rounds at the Tahoe while driving away before Davis could fire one round towards Lee.

The physical evidence also supports Davis's story. The gunshots to the Tahoe are clustered on the front-passenger side door, and the location of the gunshot wounds to Jones's and Davis's bodies and the trajectory of the bullet as it traveled through Jones, coincide with Lee taking all his shots before he drove away. Also consistent with Davis's rendition that Lee fired shots while Lee's truck was parallel to Davis's Tahoe, police found multiple .40 caliber bullet casings in the street in front of the San Gabriel house. The damage to Lee's truck further supports Davis's account that Davis fired all his shots through his front windshield. The jury heard evidence of bullet holes and

ricochet strikes to the driver's side of Lee's truck, a bullet hole in the tailgate, and a shot through the back window, consistent with Davis firing at Lee's truck as Lee drove away.

After the shooting, Lee took his truck to K.H.'s house and asked him to move it behind the privacy fence. Lee did not contact the police to report the shooting but instead waited several days before turning himself in after speaking with the police. Lee did not provide his gun's location to police either.

Viewing all the evidence in the light most favorable to the verdict, a rational jury could have found the essential elements of the offenses beyond a reasonable doubt and could have found against Lee on his self-defense claims beyond a reasonable doubt. *See Braughton*, 569 S.W.3d at 609.

We overrule Lee's first and second issues.

### MOTIONS TO SUPPRESS

In his two remaining issues, Lee contends the trial court erred by denying his motions to suppress (1) evidence that law enforcement obtained from his vehicle prior to obtaining a search warrant, and (2) statements he made during a custodial interrogation without receiving proper warnings.

*A. Standard of Review*

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Lerma v. State*, 543 S.W.3d 184, 189–90 (Tex. Crim. App. 2018). We give almost total deference to the trial court's findings of historical facts supported by the record and to mixed questions of law and fact that turn on an evaluation of credibility and demeanor. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007) (citing *Guzman v. State*, 995 S.W.2d 85, 89 (Tex. Crim. App. 1997)). We "review de novo 'mixed questions of law and fact' that do not depend

upon credibility and demeanor." *Amador*, 221 S.W.3d at 673 (quoting *Montanez v. State*, 195 S.W.3d 101, 109 (Tex. Crim. App. 2006)); *Guzman*, 995 S.W.2d at 89. We consider, in the light most favorable to the trial court's ruling, whether the record supports the trial court's explicit findings. *Miller v. State*, 393 S.W.3d 255, 263 (Tex. Crim. App. 2012). "When the trial court does not make explicit findings of fact, the appellate court infers the necessary factual findings that support the trial court's ruling if the record evidence (viewed in the light most favorable to the ruling) supports these implied fact findings." *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008). We will sustain the trial court's ruling if it is correct on any applicable theory of law and the record reasonably supports it. *State v. Arellano*, 660 S.W.3d 53, 57 (Tex. Crim. App. 2020).

### B. Evidence Obtained from Lee's Vehicle

#### 1. Relevant Facts, Parties' Arguments, and Trial Court's Ruling

Only one witness testified during the suppression hearing concerning the evidence obtained from inside Lee's truck. San Antonio Police Department Crime Scene Investigator Juan Enriquez testified that he conducted the search of Lee's truck while it was at one of the Department's secured impound garages. CSI Enriquez searched Lee's truck pursuant to a search warrant signed by a magistrate and forwarded to him by his supervisor. Further, CSI Enriquez explained that he did not know anything about the truck's seizure and towing to the impound garage.

When Lee initially challenged the admissibility of the evidence found in his truck, he objected to the propriety of the search warrant. During his argument to the trial court, however, Lee clarified his objection focusing strictly on the Department's right to seize the truck and move it to an impound lot without a warrant. Lee claimed that a warrant should have been obtained because, even though police may have suspected the truck's involvement in a crime, no imminent

danger existed that the truck would be destroyed as shown by K.H.'s and L.M.'s cooperation with law enforcement. Lee claimed that the Department's failure to obtain a warrant to *seize* the truck tainted the warrant obtained to *search* the truck.

According to the State, the truck was seized at K.H.'s house, transported to the Department's impound lot, and then searched pursuant to a properly obtained search warrant. The State added that the seizure of the truck was necessary upon learning of its location after L.M. called the police and reported that Lee drove his truck to K.H.'s house and left it and the key with K.H. Based on its appearance and hearing of the shooting on the news, L.M. believed that the truck was involved in a crime. Moreover, the State explained that upon seeing the truck, the police saw multiple gunshot holes to the outside of the truck and part of the back glass was shattered. Therefore, the State claimed that the truck's appearance and the information provided by K.H. and L.M. gave the Department probable cause to believe the truck was involved in a crime and served as contraband that should be seized to determine if it contained other evidence. The State added that the seizure without a warrant was justified by multiple exceptions to the warrant requirement, noting the evidence needed to be protected against deterioration or compromise by Lee or others with access to the truck. Because Lee had not been detained, Lee could retrieve his truck or have someone move it.

Following the suppression hearing, the trial court determined the truck was seized from the property but was not searched until after a search warrant had been obtained from a magistrate. The trial court noted that "different interests are implicated by a seizure as contrasted with a search in which there is a possessory right in a seizure versus a privacy right and a privacy interest in a search." In explaining how less intrusive a seizure is versus a search, the trial court stated that when the police have probable cause to believe a vehicle contains evidence or contraband, the

- 15 -

police are "permitted to seize a motor vehicle without a warrant in order to prevent the spoliation or loss of evidence until a warrant can be obtained."

The trial court concluded the police had probable cause to believe Lee's truck "was an instrument of a crime or involved in a crime," and that Lee "had been developed as a suspect" based on the investigation and Lee's admissions to K.H. and L.M. Additionally, the trial court noted that at the time the police saw the truck, its investigation revealed Lee and Davis exchanged gunfire and that Jones, who was a passenger in Davis's Tahoe, died. After police saw the condition of Lee's truck and concluded the truck's condition coincided with the police's investigation, the police could have anticipated spoliation or loss of evidence, providing police the probable cause to seize the truck and secure it in the Department's impound lot. Thus, the trial court denied Lee's motion to suppress, concluding that because the officers had probable cause to believe the truck contained evidence of the crime, the Department was "authorized to seize the truck without a warrant."

### 2. Arguments on Appeal and Preservation

On appeal and referring to pictures taken of Lee's truck before it was moved to the impound lot, Lee contends that an illegal warrantless search occurred when the truck's door was opened to roll down the window to allow CSI Enriquez to photograph the inside of his truck. As a result, Lee argues on appeal that "[t]he State was required to show an exception to the warrant requirement for this initial search[.]" In his brief, Lee asserts that the subsequent seizure, search of the inside of his truck, and the evidence found therein that the State sought to admit should be suppressed.

At no time during the suppression hearing did Lee contend that the State conducted an illegal warrantless search of the inside of his truck. Rather, during the suppression hearing, Lee focused his complaint on the State's need to obtain a warrant to *seize* and move his truck to the

impound lot. Additionally, the pictures Lee relies on to claim the State conducted an initial illegal warrantless search were entered into evidence and discussed without objection prior to the suppression hearing at issue.

To preserve a complaint for appellate review, the complaining party must present a timely request, objection, or motion to the trial court which states the specific grounds for the desired ruling unless the specific grounds are apparent from the context. *See* TEX. R. APP. P. 33.1(a)(1)(A); *see also Yazdchi v. State*, 428 S.W.3d 831, 844 (Tex. Crim. App. 2014). "Failure to preserve error at trial forfeits the later assertion of that error on appeal." *Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008) (citation omitted). "[A]lmost all error—even constitutional error—may be forfeited if the appellant failed to object" during trial. *See id.* (citing *Aldrich v. State*, 104 S.W.3d 890, 894–95 (Tex. Crim. App. 2003)). "This is true even though the error may concern a constitutional right of the defendant." *Id.*

Lee complains the trial court erred by not suppressing the evidence found in his truck because the Department conducted an illegal warrantless search of the inside of his truck before it was seized and moved to the Department's impound lot. Lee's complaint does not comport with his arguments during the suppression hearing and thus he has failed to preserve this complaint on appeal. *See Yazdchi*, 428 S.W.3d at 844. Lee's issue is waived. *See* TEX. R. APP. P. 33.1(a)(1)(A); *Yazdchi*, 428 S.W.3d at 844; *Fuller*, 253 S.W.3d at 232.

### 3. Preserved Appellate Argument

As explained below, we conclude the trial court did not err in denying Lee's motion to suppress the evidence found in Lee's truck.

a. Applicable Law

The Fourth Amendment protects against unreasonable searches and seizures conducted by governmental officials. *See* U.S. CONST. amend. IV; *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007). Generally, a warrantless search or seizure is *per se* unreasonable under the Fourth Amendment unless it falls within a recognized exception to the warrant requirement. *See Igboji v. State*, 666 S.W.3d 607, 613 (Tex. Crim. App. 2023).

The plain view doctrine is one such exception. Under the plain view doctrine, law enforcement may seize incriminating objects without a warrant if three requirements are met: (1) the police officer must lawfully be where the object can be plainly viewed; (2) the incriminating character of the object in plain view must be immediately apparent to the police officer; and (3) the police officer must have the right to access the object. *See State v. Betts*, 397 S.W.3d 198, 206 (Tex. Crim. App. 2013); *Keehn v. State*, 279 S.W.3d 330, 334 (Tex. Crim. App. 2009); *see also Horton v. California*, 496 U.S. 128, 136 (1990); *Coolidge v. New Hampshire*, 403 U.S. 443, 466–67 (1971) (plurality opinion).

> The "plain-view" doctrine is often considered an exception to the general rule that warrantless searches are presumptively unreasonable, but this characterization overlooks the important difference between searches and seizures. If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy. A seizure of the article, however, would obviously invade the owner's possessory interest. If "plain view" justifies an exception from an otherwise applicable warrant requirement, therefore, it must be an exception that is addressed to the concerns that are implicated by seizures rather than by searches.

*Horton*, 496 U.S. at 133–34 (citations and footnotes omitted).

The second element—that the incriminating character of the object in plain view must be immediately apparent—requires a showing of probable cause. *See Joseph v. State*, 807 S.W.2d 303, 308 (Tex. Crim. App. 1991). However, actual knowledge of the incriminating object to be obtained is unnecessary. *Id.*; *see also Horton*, 496 U.S. at 136. The Fourth Amendment does not

require a police officer to know that a suspect's property is itself illicit or probative of a crime to take temporary custody of it, but, rather, a police officer must have probable cause to believe that the property is associated with criminal activity. *See Texas v. Brown*, 460 U.S. 730, 741–42 (1983).

### b. Analysis

L.M. contacted law enforcement and requested they come to K.H.'s house because K.H. and L.M. believed Lee's truck was involved in a shooting. Thus, the police had the right to be at the house where Lee parked his truck. Lee also had already become a suspect at that time. Considering the information the police knew from the investigation at that time, seeing the gunshots to the truck including the broken back glass, and speaking with K.H. and L.M. about what they knew, the police had probable cause to believe that the truck was associated with the shooting. *See Brown*, 460 U.S. at 741–42. Moreover, neither K.H., L.M., nor the police knew Lee's whereabouts, and did not know if Lee would return to demand his truck or whether other circumstances risked the loss or destruction to potential evidence involving the truck. *See King*, 563 U.S. at 472. Because the truck itself was evidence, it could be seized. *See Betts*, 397 S.W.3d at 206.

To the extent Lee preserved his appellate complaint regarding the seizure, not the search, of his truck, the police were lawfully at the truck's location, the incriminating gunshot holes to the outside of the truck were clearly visible, and the police could access the truck by having it towed, thereby, satisfying the elements of the plain view doctrine exception to the warrant requirement. *See Betts*, 397 S.W.3d at 206. We conclude the trial court did not err by denying Lee's motion to suppress the seizure of his truck from K.H.'s house without a warrant. *See Soldal v. Cook County, Ill.*, 506 U.S. 56, 65–66 (1992) ("Suppose, for example, that police officers lawfully enter a house, by either complying with the warrant requirement or satisfying one of its recognized exceptions—

e.g., through a valid consent. . . . If they come across some item in plain view and seize it, no invasion of personal privacy has occurred."); *Washington v. Chrisman*, 455 U.S. 1, 5–6 (1982) ("The 'plain view' exception to the Fourth Amendment warrant requirement permits a law enforcement officer to seize what clearly is incriminating evidence or contraband when it is discovered in a place where the officer has the right to be.").

We overrule Lee's third issue.

### C. Custodial Statements

#### 1. Applicable Law

The State "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Interrogation includes (1) "express questioning" and (2) "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

A defendant's oral statement made as a result of custodial interrogation is inadmissible in a criminal proceeding unless a recording is made of the statement, and prior to the statement but during the recording, the accused is given the warnings provided in article 38.22, section 2, subsection (a). *See* TEX. CODE. CRIM. PROC. ANN. art. 38.22, §§ 2(a), 3(a). The warnings relevant to Lee's complaint pertain to his right to remain silent and that any statement made may be used as evidence against him at trial, the right to have a lawyer present to advise him prior to and during any questioning, and the right to terminate the interview at any time. *See id.* art. 38.22, §§ 2(a)(1), (2), (3), (5), 3(a)(2). Also, for Lee's oral statements to be admissible, he must have knowingly,

intelligently, and voluntarily waived those rights prior to making any statement. *See id.* art. 38.22, §§ 3(a)(2), 6. A "statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion." *See* TEX. CODE CRIM. PROC. ANN. art. 38.21.

We undertake a two-part inquiry into whether a defendant's waiver is valid. *See Berghuis v. Thompkins*, 560 U.S. 370, 382–83 (2010); *Joseph v. State*, 309 S.W.3d 20, 25 (Tex. Crim. App. 2010). First, the waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Berghuis*, 560 U.S. at 382 (citation omitted); *Joseph*, 309 S.W.3d at 25. Second, the waiver must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Berghuis*, 560 U.S. at 382–83 (citation omitted); *Joseph*, 309 S.W.3d at 25. Courts consider the totality of the circumstances surrounding the interrogation. *Joseph*, 309 S.W.3d at 25.

## 2. Analysis

Lee complains about the admission of oral statements he gave while in custody because (1) he was not given a card to sign indicating he waived his *Miranda* and article 38.22 rights and (2) he was not told he could leave and return to his cell at any time during the interview. Furthermore, Lee argues his "statements were also taken with utter disregard of the fact [he] had appointed counsel at the time of the interview." The State, however, contends Lee's arguments lack merit. We agree.

Regarding the recorded interviews, Detective Soto testified that he interviewed Lee in an interview cell at the Bexar County Jail and that he read Lee his full *Miranda* warnings before questioning him. Detective Soto also affirmed that Lee did not appear to be under the influence of any intoxicants during the interviews and nothing suggested that Lee did not understand his rights.

The trial court admitted both recorded interviews into evidence. At the beginning of each recorded interview, Detective Soto explains to Lee that he needs to read Lee his rights prior to questioning him. Detective Soto then states each individual right and pauses to assure Lee understands each right as read to him. Lee acknowledges his understanding by nodding yes as well as verbalizing his understanding. After reading the complete list of rights to Lee, Detective Soto again askes Lee if he understands his rights and has agreed to talk to him. Lee verbally agrees. Throughout Lee's first recorded interview, Detective Soto tells Lee numerous times that Lee does not have to "talk"; that if Lee wants Detective Soto to leave, he will; and that if Lee wants to talk to a lawyer, he can. Although Lee's second interview lasts just a few minutes—ending in an argument between Detective Soto and Lee wherein Detective Soto terminates the interview, and Lee agrees to end it—Detective Soto reiterates to Lee that he does not have to "talk" if he does not want to.

Lee contends his oral custodial statements are inadmissible because he did not sign a card indicating he waived his rights. Lee, however, failed to make this argument in his written motion to suppress or during the suppression hearing and therefore he has waived this issue. *See* TEX. R. APP. P. 33.1; *Lugo v. State*, 299 S.W.3d 445, 449–50 (Tex. App.—Fort Worth 2009, pet. ref'd) (holding defendant failed to preserve appellate review because complaint on appeal did not comport with defendant's complaints during trial). Nonetheless, an accused must only sign written custodial statements, not oral statements. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 § 1(2)(A). The admission of oral statements, on the other hand, is governed by article 38.22, section 3, which requires the recording to capture the accused being read or told his rights listed in article 38.22, section 2(a), and the accused knowingly, intelligently, and voluntarily waiving those rights prior

to making any statements. *See id.* art. 38.22 § 3(a)(2) (referencing the rights provided in article 38.22, section 2(a)).

Next, Lee asserts that Detective Soto failed to inform him of his right to terminate the interview and return to his cell. At the beginning of each interview, Detective Soto, reads Lee his rights, including Lee's "right to terminate the interview at any time[,]" and Lee acknowledges that he understands that right. *See id.* art. 38.22 § 2(a)(5). Throughout the first interview, Detective Soto tells Lee several times that Lee does not have to talk to him and can end the interview "right now." In the second interview, while Lee acknowledges he understands his rights and chooses to waive them and speak with Detective Soto again, shortly into the conversation they begin to argue and both terminate the interview.

Last, Lee argues his statements were "taken with utter disregard of the fact [Lee] had appointed counsel at the time of the interview[s]." Included within the rights Detective Soto reads to Lee at the beginning of both interviews was his "right to have a lawyer present to advise him prior to and during any questioning." *See id.* art. 38.22 § 2(a)(3). Lee unequivocally acknowledges that he understands his right, waives the right, and agrees to speak with Detective Soto. At no time during the interviews did Lee request a lawyer. *See State v. Gobert*, 275 S.W.3d 888, 892–93 (Tex. Crim. App. 2009) (directing that a defendant must clearly and unambiguously invoke the right to counsel). The United States Supreme Court has "explicitly declined to hold that a defendant who has obtained counsel cannot himself waive his right to counsel." *Michigan v. Harvey*, 494 U.S. 344, 352 (1990). Thus, absent clearly invoking his right to counsel, a defendant who is already represented by counsel may waive his right to have counsel present during an interview.

The trial court did not err in denying Lee's motion to suppress his oral statements.

We overrule Lee's fourth issue.

## CONCLUSION

Having overruled all of Lee's appellate issues, we affirm the trial court's judgments of conviction.

Irene Rios, Justice

DO NOT PUBLISH